THE STATE ex rel. HERBERT E. JOHNSON, Appellant, v. W. A. CLARK et al., Constituting State Board of Health.

In Banc, July 8, 1921.

1. **BOARD OF HEALTH: Revoking Physician's License: Presumption That Majority Were Present.** Where the record of the Board of Health shows that five of its seven members were present when the charges against a physician were heard on October 28th, it will be presumed, in the absence of evidence to the contrary, that the members of the board, being public officers, discharged their duties regularly and properly, in accordance with the law, and that a majority were present on December 3rd when the license was suspended.

2. ————: ————: **Incompetent Evidence: Dying Declaration.** A license to practice medicine is a valuable privilege, and the statutes authorizing the Board of Health to suspend a physician from practice is highly penal in its nature, and is to be construed strictly against the board and in favor of the physician; and although the board is but an administrative or ministerial body, it cannot consider evidence, make a finding and render judgment thereon, when such evidence would admittedly have been inadmissible in a court of law. Where the uncorroborated declaration attributed by another physician to a deceased woman was not made under the impression of immediate and impending death, and constituted the only positive evidence upon which the board's order of suspension was predicated, such order based upon such incompetent evidence cannot stand.

3. ————: ————: ————: **Reputation: Hearsay.** In a hearing before the Board of Health against a physician charged with having committed abortion, testimony of another physician that "there was a great deal of belief that this man did cause abortions" and of another to the effect that from conversations with his patients he was very positive that said physician had been producing abortions, is error and prejudicial, and to base an order of suspension upon such hearsay testimony is contrary to the established principles of law.

Appeal from Cole Circuit Court.—*Hon. J. G. Slate,* Judge.

REVERSED.

*Irwin & Haley* for relator.

(1)   The judgment in this case is insufficient and cannot stand, because the same does not meet the requirements of Sec. 8317, R. S. 1909, now Sec. 7336, R. S. 1919. Said section, among other things, provides that: "If a majority of the board are satisfied that the licentiate is guilty of any of the offenses charged, the license shall be revoked for such period of time as may be agreed upon." It is the position of respondents that relator was found "guilty as charged" at a meeting of the board, alleged to have been held at Jefferson City, December 3, 1920. At no place in the record does it appear what members of the board, if any, were present when such action was taken by the board; and particularly does the record fail to show that a majority of the members of the board were present at said meeting, if there was, in fact, such a meeting, or that a "majority of the board are satisfied that the licentiate is guilty of the offense charged." (2). The license of a physician to practice medicine or surgery is a valuable property right, and a statute which authorizes the State Board of Health to revoke the license of a physician to practice medicine is highly penal. State ex rel. Spriggs v. Robinson, 253 Mo. 271; State v. Mo. Dental Board, 221 S. W. 72. (3)   Sec. 7336, R. S. 1919, being a penal statute, must be strictly construed against the respondents, as the representatives of the State, and liberally construed in favor of relator. State ex rel. Spriggs v. Robinson, 253 Mo. 284. (4)   The testimony of Dr. Jose as to the alleged declarations of Edna Boothby was clearly inadmissible. Sec. 4034, R. S. 1919; State v. Johnson, 118 Mo. 501; State v. Colvin, 226 Mo. 482; State

State ex rel. Johnson v. State Board of Health.

v. Gow, 235 Mo. 307; State v. Horn, 204 Mo. 528; State
v. Parker, 172 Mo. 194; State v. Zorn, 202 Mo. 12. (5)
The testimony of Dr. Gillham to the effect that "there
was a great deal of belief and talk that this man (re-
ferring to relator) did cause abortions" was clearly er-
roneous. State v. Wellman, 253 Mo. 302; State v. Teet-
er, 239 Mo. 475; State ex rel. v. Robinson, 253 Mo. 271.
(6) Likewise is the testimony of Dr. Hill, to the effect
that from conversation had by him with patients that he
was very positive that Dr. Johnson had been committing
abortions, inadmissible and erroneous. Cases supra. (7)
Sec. 7336, R. S. 1919, is unconstitutional and void, in
that (a) Said act is in violation of Section 30, Article
II, of the Constitution, in that it deprives relator of
an existing vested right, and of an existing vested proper-
ty right, and of liberty and property rights, without due
process of law. (b) Said act is in violation of Section
28, Article II, of the Constitution, in that this relator
has been denied the right of trial by jury. (c) Said
act is in violation of Article III of the Constitution, in
that said act vests in the State Board of Health judicial
functions.

*Jesse W. Barrett,* Attorney-General, and *Albert
Miller,* Assistant Attorney-General, for respondent; *H.
J. Westhues* of counsel.

(1) The order and judgment of the board is suffi-
cient; and the board fully complied with the require-
ments of Sec. 7336, R. S. 1919. (a) For the purpose
of this appeal, the action of the board will be presumed
to be regular, in the absence of any facts to the contrary
appearing in the record. City of St. Joseph v. Farrell,
106 Mo. 441; Belkin v. Rhodes, 76 Mo. 652; Bayha v.
Kessler, 79 Mo. 559; Brewing Co. v. Niederweiser, 28
Mo. App. 236. (b) In a trial, upon complaint, before
the State Board of Health, it is not necessary that the
proceedings should be conducted with that degree of

exactness which is required upon trial for a criminal offense in an ordinary tribunal of justice. Such board is not a judicial tribunal. Meffert v. State Board of Medical Registration, 66 Kan. 710, 195 U. S. 625; Traer v. State Board of Medical Exam., 106 Iowa, 559; Munk v. Fink, 116 N. W. (Neb.) 525, 17 L. R. A. (N. S.) 439; State ex rel. v. Goodier, 195 Mo. 560, 562; Spurgeon v. Rhodes, 167 Ind. 12; People v. Apfelbaum, 251 Ill. 23. (2) Sec. 7336, R. S. 1919, authorizing the State Board of Health to revoke a license to practice medicine for unprofessional and dishonorable conduct, is not unconstitutional. (a) It does not violate Section 30, Article II, of the Constitution of Missouri, which declares: "That no person shall be deprived of life, liberty or property without due process of law." State v. Hovorka, 110 N. W. (Minn.) 870; Reetz v. Michigan, 188 U. S. 505; St. Louis v. Missouri Pac. Ry. Co., 211 S. W. 672; State ex rel. v. Purl, 228 Mo. 22; Morse v. State Board of Medical Examiners, 122 S. W. (Tex.) 448; People v. Apfelbaum, 251 Ill. 22; Re Smith, 10 Wend. 449; State ex rel. v. McIntosh, 205 Mo. 636. (b) It does not violate Section 28, Article II, of the Constitution of Missouri, which declares: "The right of trial by jury,. as heretofore enjoyed, shall remain inviolate." Munk v. Fink, 116 N. W. (Neb.) 525, 17 L. R. A. (N. S.) 439; Gulley v. Territory, 91 Pac. (Okla.), 1037; Re Smith, 10 Wend. 449. (c) It does not violate Article III of the Constitution of Missouri. The power conferred upon the State Board of Health to revoke a physician's license for cause is an administrative, and not a judicial function. Munk v. Fink, 116 N. W. (Neb.) 525, 17 L. R. A. (N. S.) 439; State ex rel. v. Goodier, 195 Mo. 563; Spurgeon v. Rhodes, 167 Ind. 11; People v. Apfelbaum, 251 Ill. 23. (d) Said act is not in violation of the Fourteenth Amendment to the Constitution of the United States. It does not abridge the privileges and immunities of a citizen of the United States, and does not deprive relator of liberty and property without due pro-

cess of law, nor does it deny to relator the equal protection of the law.   Spurgeon v. Rhodes, 167 Ind. 12; Reetz v. Michigan, 188 U. S. 505.

ELDER, J.—This is an appeal from a judgment rendered by the Circuit Court of Cole County upon a writ of *certiorari* directed to respondents as members of the State Board of Health of Missouri, which judgment affirmed the action of the said board in suspending, for a period of five years from Decmber 3, 1290, the license of relator herein to practice medicine and surgery.   The pleadings and facts involved are substantially as follows:

Relator is a duly licensed and practicing physician of Jefferson City, Missouri.   On September 14, 1920, Honorable H. J. Westhues, Prosecuting Attorney of Cole County, filed a complaint before the State Board of Health, charging that relator had been and was guilty of unprofessional and dishonorable conduct in this, to-wit:  "That he, the said Herbert E. Johnson, on or about the 26th day of August, 1920, in the City of Jefferson City, State of Missouri, unlawfully produced a criminal abortion upon one Edna Boothby, a pregnant woman; he, the said Herbert E. Johnson, being then and there aforesaid a licensed physician and then and there not intending necessary medical or surgical treatment; not being then and there engaged in an act necessary to preserve the life of said Edna Boothby, or that of an unborn child, and not then and there intending any injury other than the destruction of the pregnancy."   The said complaint prayed that an inquiry be had and that relator's license to practice medicine and surgery in this State be revoked.

Pursuant to such complaint notice was served upon relator that a hearing upon the charges preferred would be held before the said Board of Health, and, on October 28, 1920, such hearing was had at the City of Jefferson, when and where relator appeared in person and by attorney.

The evidence for respondents consisted of the oral testimony of Doctors J. E. Jose, Frank W. Gillham and James A. Hill, all of Jefferson City.

Dr. Jose, upon direct examination, testified that he had known Edna Boothby for the last eighteen months or two years; that he treated her in her last illness; that he was called to her home on August 30th, reached there about ten o'clock in the morning and found her trying to expel an afterbirth; that he knew from the afterbirth that there must have been a baby, but that he did not see a baby. Over the objection of counsel for relator the witness was permitted to testify as follows:

"Q. Did she tell you whether or not an abortion was performed upon her? A. Yes, sir.

"Q. Did she state to you who performed the abortion? A. She said Dr. Johnson performed the abortion on her on Thursday before.

"Q. Was anyone else present at the time? A. No, sir."

The witness further testified that he called in Doctors Gillham and Hill, but that Dr. Hill did not arrive until the girl was dead; that about one o'clock the next morning he telephoned the relator "that the girl had died and that she made a confession before she died; that if he wanted to know any of the particulars he could see me in the morning."

On cross-examination Dr. Jose testified that Miss Boothby died on August 31st about eleven or eleven-thirty o'clock at night, while he was present; that on the day before, at the time she made the statement with reference to relator, she was rational.

"Q. Say anything about that she realized the end was near, or say anything about dying? A. No.

"Q. Or any words to that effect? A. No, nothing said about that, neither by her nor me. . . .

"Q. And outside of the girl's statement to you, you know nothing about the trouble at all? A. I know

the girl was in a family way. . . . . I know that the girl came to me and told me she was that way and wanted to know what she could do to get shut of it; but that was some month or so before this. . . . And I told her I couldn't do it, and she wanted to know what to do, and I told her to go to a maternity hospital at St. Louis. . . . She told me she knew where she could have it done here, but she didn't like to go to the man. . . .

"Q. Did she call the man's name? A. Yes, sir.

"Q. Whose name did she mention, if she mentioned it? (Objection by counsel for relator. Objection overruled.. Exception saved). A. Dr. Johnson was the man that she said she could go to."

Dr. Gillham testified that on or about August 30th or 31st he was called to the home of Miss Boothby by Dr. Jose; that he found the girl "in an unconscious condition, just at the point of death; in fact, she died in an hour or forty-five minutes after I arrived on the scene.

"Q. Well, what was the cause of her death? A. Apparently a general peritonitis.

"Q. What had happened to the girl? A. I did not make an examination, that is, a vaginal examination; her abdomen was swollen up, she was pulseless, in a state of coma; just in the last—just dying in fact.

"Q. Those things happen in an abortion performed sometimes? A. From the history of the case I think so. . . .

"Q. Dr. Gillham, do you know whether or not there was a great deal of belief and talk that this man did cause abortions? A. I do." (Objection by counsel for relator).

Dr. Hill testified that he was called to attend Miss Boothby on or about August 30th or 31st and "found her breathing her last; she was practically gone when I reached there; she died in about five minutes, I judge.

"Q. Doctor, I will ask you this, do you know the

666     SUPREME COURT OF MISSOURI,

State ex rel. Johnson v. State Board of Health.

reputation of Dr. Johnson with reference to committing abortions? A. Yes.

"Mr. Haleys I object to that question, because he is not charged here with committing more than on abortion; it is seeking to charge him with offenses not mentioned in the complaint or information.

"Dr. Clark Answer the question, Doctor." (Exception by relator). A. The reputation in regard to Dr. Johnson as to abortions I have—from patients of mine I have been very positive he has been doing it.

Mr. Haley: I move that the answer be stricken out, for the reasons assigned in the objection." (No ruling on the motion.)

Dr. Johnson, the relator, testified in his own behalf, that he was a regular licensed physician and had been practicing in Jefferson City since 1907; that the last time Edna Boothby was at his office was "about between 9:30 and 10:30 o'clock on the twenty-seventh day of August" and that "she was there, though, on the twenty-sixth also.

"Q. On the twenty-sixth when she was there just tell the board what took place. A. She came to my office and asked me to examine her. I examined her and told her she was about five or six months pregnant. She told me that her womb was inflamed and asked me to examine her womb. I put her on the table and took my speculum and inserted it, and took a pair of dressing forceps and examined her womb, and found that her womb was inflamed about the size of a half dollar. I let her off my table and told her that her womb was inflamed and someone had been fooling with her, else she had been fooling with her. I told her I couldn't do anything for her, because her womb was inflamed and I couldn't fool with her. She said, 'Doctor, if you will do something for me there is a doctor in town that will look after me.' I told her I couldn't do anything for her. She asked me how much she owed me for the examination. I told her she owed me two dollars and fifty cents.

She says, 'Well, I haven't got the money now, but I will send it to you the first of the month.' I told her I would not be in town the first of the month, but she could send it to my wife. And she left. The following morning she came back again and asked me would I do this work for her. I told her I could not do it. And she didn't get any further on the twenty-seventh of August than in my first front room.

"Q. Just a moment. When she said she wanted you to do this work, what was she referring to? A. She wanted me to commit an abortion on her.

"Q. You say she came back the next day? A. She came back the next day—the next morning.

"Q. Did you take her into your private operating room? A. No sir.

"Q. Was anybody present with her when she came? A. No one at all.

"Q. Did you see her after that time? A. I didn't see her after that time.

"Q. Do you remember on the thirty-first day of August Dr. Jose called you by telephone? A. He called me about one o'clock, on the first day of September; it was about one o'clock he called me and told me that the Boothby girl died and he would like to see me at his office the next morning—that morning; I told him that I would be out of town; I had already made arrangements to go to Kansas City to take an intensive training course at the general hospital, and was due there at ten o'clock Wednesday morning, and I had already called up the taxicab at ten o'clock that night to come after me in order to get me to the station to make the train. I had previously announced in church that I would be out of the city for thirty days. I had called up Dr. Amos here in town and asked him to look after some patients for me for thirty days while I was out of town, and told him that I was sending one of Duke Digg's men to him Wednesday morning to get his hand treated for having mashed it moving a piano.

668    SUPREME COURT OF MISSOURI,

State ex rel. Johnson v. State Board of Health.

"Q. So these arrangements to leave, as I understand, were made before Dr. Jose had communicated the death of the Boothby girl to you? A. I had been making arrangements to leave ever since we had our medical association in St. Louis in May—in June.

"Q. Now, I will ask you if you, on the twenty-sixth day of August, 1920, or at any other time, produced an abortion on—A. I did not.

"Q. Edna Boothby? A. I did not.

"Q. Did you insert anything into her womb, or open her womb? A. I didn't open her womb. I only inserted—I made the examination of her womb by inserting a speculum and using a pledget of cotton on a dressing forcep.

"Q. Would what you did on that occasion be calculated to produce an abortion? A. Impossible, because someone had been fooling with her, or else she had been fooling with herself previous to the time.

"Q. I will ask you, Doctor, if you treated the Boothby girl before this occasion? A. I had treated her about a year ago, possibly a little over a year.

"Q. For what? A. Venereal trouble.

"Q. Had she been to your office a number of times before? A. She had been to my office about a year, or a little over a year ago, three or four times."

On cross-examination the relator testified:

"Q. The evidence you found, as you state, you think some one had been trying to perform an abortion on her? A. I know someone had.

"Q. It wouldn't be the work of the doctor, would it? A. How is that?

"Q. Would it be the work of a doctor? A. Well, I couldn't positively say. Her womb was inflamed. There was an inflamation about the size of a half dollar there at the os of the uterus.

"Q. Was it such an inflamation that you found at that time that would produce an abortion? A. It was.

"Q. In your judgment do you think the way you

found it, do you think it would have been necessary to have done anything further? A. Well, possibly something else further could have been done.

"Q. Was there anything further necessary to be done in order to perform the abortion? A. Not necessarily.

"Q. Did you advise her that she would have a miscarriage? A. No, I told her I couldn't do anything for her."

On re-cross-examination relator testified:

"Q. Could you see where any instrument had been used? A. Well, I—I didn't see where any instrument had been used, but I knew—I judged from the fact that the os was open that there had been something used.

"Q. How could you tell, doctor? A. Well, the os was open and naturally, the os being opened, I judged that something had been used."

Subsequent to the hearing aforsaid, to-wit, on December 3, 1920, the Board of Health held a meeting at Jefferson City, at which meeting, according to the minutes thereof, the evidence adduced at the hearing given relator was considered. The minutes do not disclose what members of the board were present. The finding and order made by the board, as recited in the minutes, is as follows:

"A motion was made, seconded and carried that it is the decision of this board that Dr. Herbert E. Johnson is guilty as charged. The following motion was made, seconded and carried: That Dr. Herbert E. Johnson being found guilty as charged, it is the judgment of this board that his Missouri state license to practice medicine and surgery be and it is so ordered hereby suspended for a period of five years from this date, and the secretary is instructed to inform Dr. Johnson of the action of this board, immediately, by registered mail."

Pursuant to the instruction given, the secretary of the board, under date of December 3, 1920, notified relator of the action taken by the board.

Thereafter, within due time, relator filed a petition in the Circuit Court of Cole County for a writ of *certiorari* which was issued by the clerk in vacation and served upon respondents. Pursuant to said writ, the respondents, on December 30, 1920, filed their return thereto, such return consisting of a copy of the complaint, of notice thereof, and of the evidence taken before the Board of Health, together with extracts from the minutes of the meeting of the board at which the order of suspension was made. The order of the board having been sustained by the court, and relator having appealed, the matter comes on here for review.

I. Relator contends that the judgment rendered is insufficient for the reason that it does not meet the re-

Presumption
of Regularity.

quirements of Section 8317, Revised Statutes 1909, now Section 7336, Revised Statutes 1919. In support of such contention learned counsel for relator argue that at no place in the record does it appear what members of the Board of Health, if any, were present at the meeting when the order suspending the license of relator was made, nor is it shown that a majority of the members of the board were present at such meeting, in compliance with the statutory provision that, "If a majority of the board are satisfied that the licentiate is guilty of any of the offenses charged, the license shall be revoked for such period of time as may be agreed upon."

The record of the proceedings had at the hearing upon the charges preferred against relator shows that five out of the seven members of the Board of Health were present, that relator appeared at such hearing in person and by attorney, that his counsel cross-examined the witnesses appearing against him, and that relator testified in his own behalf. True, the record is silent as to the number of members of the board who were present at the meeting at which the license of relator was ordered suspended. However, in the absence of evidence to the contrary (of which there is none), it is to be presumed that

the members of the board,. being public officers, discharged their duty regularly and properly, in accordance with the law. [City of St. Joseph v. Farrell, 106 Mo. 1. c. 441.] Accordingly, the presumption follows, that when the board acted, a majority of the members thereof were present.

We must therefore rule the point against the relator.

II. Relator next assigns as error the admission of the testimony of Dr. Jose relative to the statement made by Miss Boothby as to relatior having performed an abortion upon her.

<span style="float:left">Incompetent Evidence.</span>

The learned Attorney-General, for respondents, insists that the practice and proceeding before the Board of Health "is more flexible than that allowable in the courts, and any evidence which tends to prove or disprove the point in issue may be introduced, although not the best evidence obtainable." As authority for such insistence the Attorney-General cites State ex rel. McAnally v. Goodier, 195 Mo. 551. That case was an original proceeding in prohibition, brought against the State Board of Health to prohibit it from proceeding with a hearing upon charges preferred against the relator. This court there held that prohibition would not lie, as the Board of Health is not a judicial body, but merely exercises ministerial functions. Based upon this enunciation, respondents would have us declare in the instant case that the board, being but an administrative or ministerial body, can consider evidence, making a finding, and render judgment thereon, when such evidence would admittedly have been inadmissible in a court of law. Such is not our conception of what is consonant with the policy of the law.

The statute under which respondents acted (Sec. 8317, R. S. 1909, now Sec. 7336, R. S. 1919) has been held to be highly penal in its nature. [State ex rel. Spriggs v. Robinson, 253 Mo. 271.] Such being the case it is to be construed stritly against respondents and liberally in favor of relator. [State ex rel. Spriggs v. Robinson, supra; State v. Koock, 202 Mo. 223; State v. McMahon,

234 Mo. 611.] Moreover, respondents cannot act arbitrarily, nor against the rules of evidence. [State ex rel. McCleary v. Adcock, 206 Mo. l. c. 558.] The declaration attributed to the deceased young woman was not made under an impression of impending and immediate death, as evidenced by the decisively negative answer of Dr. Jose to the question, "Say anything about that she realized the end was near, or say anything about dying?" That being true, the statement would unquestionably, under the rules of evidence, have been inadmissible in a criminal proceeding before a court. [State v. Johnson 118 Mo. 491; State v. Colvin, 226 Mo. l. c. 481; State v. Nocton, 121 Mo. 537; State v. Kelleher, 201 Mo. 614; State v. Gow, 235 Mo. 307.] And we see no just reason and find no precendent to the contrary in this State, as to why a similar rule should not prevail in a hearing before the State Board of Health, when a valuable privilege, if not a property right, depends upon the outcome of that hearing. To let down the bars and admit uncorroborated hearsay testimony, which the record here discloses constitutes the only possible positive evidence upon which the order of the board can be predicated, is not consistent with the practice which should be followed in inquiries of even a *quasi*-judicial nature. The entire record being before us for review, and a careful scrutiny thereof having revealed no evidence corroborative of the declaration made by Miss Boothby, we hold that the admission and consideration of the testimony complained of was incompetent and prejudicial to the rights of the relator.

III. Relator insists that error was committed in admitting the testimony of Dr. Gillham that "there was a great deal of belief that this man (referring to relator) did cause abortions," and the testimony of Dr. Hill to the effect that from conversations had by him with his patients he was very positive that relator had been producing abortions. To this contention we are constrained to give assent in, considering a similar question, BROWN, P. J.

Reputation and Hearsay.

speaking for the court in State ex rel. Spriggs v. Robinson, 253 Mo. l. c. 285, 286, said: "Coming back to the facts in this case we find no insistence in the brief of the Honorable Attorney-General that the conviction and suspension of appellant can be substained . . . upon the evidence of Dr. Hiller to the effect that several physicians of Joplin had told him that appellant bore the reputation of being a criminal abortionist. It would certainly have been an insult to the intelligence of the age to contend that a judgment could be sustained on the mere hearsay evidence of Dr. Hiller, *which ought not to have been admitted or considered by respondents.*" (Italics ours). And so in the case under review, while we are in thorough sympathy with the laudable aim and purpose of the Board of Health to rid the medical profession of practitioners guilty of dishonorable conduct, we must nevertheless accord to the accused every right given him by the law. To render a conviction bottomed upon the veracity and competency of persons other than witnesses testifying under oath, which the record here would alone seem to warrant, would be contrary to the established principles of all law.

Further questions, including the unconstitutionality of the act under which respondents have proceeded, are urged by relator. From the views thus far indicated it is apparent, however, that the order made by respondents will have to be annulled, for which reason it is unnecessary for us to rule upon the additional errors assigned.

Our order is that the action of respondents in suspending the license of relator to practice medicine and surgery be quashed, and that the judgment of the circuit court affirming and upholding such action be reversed.

All concur, except *James T. Blair, C. J.,* and *David E. Blair, J.,* who dissent.