THE STATE EX REL. S. E. BALL v. STATE BOARD OF HEALTH ET AL.,
Appellants.—26 S. W. (2d) 773.

Court en Banc, April 8, 1930.

*Stratton Shartel,* Attorney-General, and *A. B. Lovan,* Assistant Attorney-General, for appellants.

*Harris L. Moore* and *John W. Moore* for respondent.

FRANK, J.—This is an appeal from a judgment of the Circuit Court of Caldwell County quashing the record of the State Board of Health revoking the license of relator, Dr. S. E. Ball, to practice medicine and surgery in the State of Missouri.

On August 30, 1926, a complaint was filed with the State Board of Health charging relator with unprofessional conduct in that he did at Excelsior Springs, Missouri, between September, 1925, and August, 1926, unlawfully solicit patronage by agents. After notice to relator, a hearing was had before the board, at which relator appeared in

person and by attorney. After hearing and considering the evidence of both complainant and relator, the board, by order entered of record, revoked relator's license to practice medicine and surgery in the State of Missouri. A writ of certiorari was issued by the Circuit Court of Clay County to review the proceedings and orders of the board. In obedience to this writ, the board made return of all its proceedings to said circuit court. Thereafter a change of venue was awarded to the Circuit Court of Caldwell County, where, after hearing, the order of the board revoking relator's license was quashed, and the board was ordered to restore said license to relator. From this judgment an appeal was granted to this court.

Relator has filed a motion to dismiss the appeal on account of alleged defects in the abstract. We have examined the abstract in the light of the grounds urged in the motion to dismiss and find nothing which would justify a dismissal of the appeal. The motion is overruled.

It is contended that the order revoking relator's license is void because not made at a legal meeting of the board. The record shows that the hearing was had and relator's license revoked at a called meeting of the board, at which meeting six members of the board were present and one absent. The gist of relator's contention is that as all members of the board were not present, and as the record does not show that there was a call made or time fixed for the meeting, by the board, as provided by Section 5776, Revised Statutes 1919, the meeting was unauthorized and no business could be legally transacted thereat. The pertinent part of Section 5776, supra, provides that the meetings of the board shall be in January and July of each year, and at such other times as the board may deem expedient, and that four members shall constitute a quorum. It is true that it does not appear how or by whom this meeting was called, but the fact that the record does not show the call does not necessarily render the meeting illegal or unauthorized. The record of the board contains the following recitation:

"A called meeting of the Missouri State Board of Health was held at the Hotel Snapp in Excelsior Springs, Missouri, on the 23rd day of November, 1926 at 1:30 P. M. The following members were present."

Then follows the names of all members of the board showing six members present and one absent.

The board had power to call this meeting and the record recites it was a called meeting. Four members of the board constitute a quorum. Six of the seven members were present and participated in the meeting. In the absence of evidence to the contrary it should and will be presumed that the meeting was legally and properly convened. A kindred question was before us in Rutherford v. Hamilton, 97 Mo. 543, 548, 549, 11 S. W. 249, whereat we said:

"Defendant claims that proper approval of the contract for the work was never given because of the facts shown regarding the time and circumstances of the council meeting when the contract was acted upon. Under the city charter, the mayor had power to call a special meeting of the council at any time. A majority of the members constituted a quorum. Here a meeting appears to have been held in which eight of the ten members participated. The mayor presided. Nothing is stated regarding the cause of their assembling. It may have been upon special call of the mayor, or in supposed compliance with the adjournment of eight days before. It appears that regular municipal business was transacted, and the record thereof was preserved in the usual way by the proper officer. In the absence, therefore, of any evidence to the contrary, it will be presumed that these public officers rightly acted in the premises, and that the meeting was properly convened. [Chouteau Ins. Co. v. Holme's Admr., 68 Mo. 601; State ex rel. v. Smith, 22 Minn. 218; State v. Vail, 53 Iowa, 550; Cit. Mut. Fire Ins. Co. v. Sortwell, 8 Allen, 217; Granger v. Mill Co., 59 Cal. 678.]"

In 43 Corpus Juris, page 501, section 765, it is said:

"In the absence of any evidence to the contrary it will be presumed that the meeting of a municipal council was regularly held and valid. If proceedings were had at a special meeting, it will be presumed that the meeting was regularly called and held. So if the proceeding was had at an adjourned meeting, it will be presumed until the contrary appears that the meeting was regularly adjourned."

Contention is made that the evidence does not show that relator solicited patronage by agents. Relator admits that paid runners or agents met all trains coming into Excelsior Springs and solicited business, but bases his contention on two propositions, (1) that such soliciting was for board, rooms and baths and not for patients to be treated, and (2) that the soliciting was done for the Health Culture Company and not for him.

As relator admits that business was solicited, our only task is to determine who did it, and the purpose for which it was done. We will take first relator's contention that the soliciting was done by and for the Health Culture Company and not by him. The evidence adduced at the hearing before the board showed that relator had a license to practice medicine and surgery in this State. He located in Excelsior Springs about seven years prior to this proceeding, and for some time operated a sanitarium known as Dr. Ball's Health School. Later he organized and was the managing head of three institutions, namely, Dr. Ball's Health School, Health Assurance Association and Health Culture Company.

Dr. Ball's Health School was merely a trade name and had no actual existence, corporate or otherwise. The Health Culture Company was a corporation organized under the law relating to manufacturing

and business companies and owned several buildings in Excelsior Springs which it used for the purpose of furnishing board, rooms and baths to its patrons, and in connection therewith, conducted a sanitarium or hospital where persons suffering with physical ailments were examined and treated. Relator and his wife owned ninety-three per cent of the stock in this corporation.

The Health Assurance Association was organized as a benevolent corporation by pro-forma decree of the Circuit Court of Jackson County. Its alleged purpose was the promotion of health generally. It owned no property. Business transacted in its name was financed by the Health Culture Company. At the time the Health Culture Company was incorporated, no money was paid into its treasury. It was incorporated for $250,000, divided into 250,000 shares of the par value of one dollar each, one-half of which was actually subscribed. The stock subscribed was paid for by relator transferring to the corporation real and personal property which he had theretofore used in the operation of the sanitarium known as Dr. Ball's Health School. Neither the Health Assurance Association or Dr. Ball's Health School owned any property. The business transacted by them was financed by the Health Culture Company.

Relator was the managing head of all these institutions and dictated and controlled their policies. One witness testified that relator told him "that he might be sometime charged with soliciting business, and in order to get around that, he would hire these solicitors in the name of the Health Assurance Association and in that way perhaps avoid any such prosecution." This witness further testified:

"Q. Can you state whether or not it is true that that was one of the objects of the organization of the Health Assurance Association? A. Yes, sir, it was.

"Q. Were you one of the organizers of that company? A. Yes, sir.

"Q. And at that time were you in the employ of Dr. Ball? A. Yes, sir.

"Q. Now who was it that directed the organization of that society? A. Dr. Ball.

"Q. Who had control of it after it was organized? A. Dr. Ball."

Another witness testified that Dr. Ball told him that a doctor's license could be revoked for soliciting business and for that reason he took the solicitor's license in the name of the Health Assurance Association. The record shows that the runners who met incoming trains were licensed by the city as solicitors for the Health Assurance Association, and their wages were paid by check signed by said association, but the money was furnished by the Health Culture Company.

Summed up, the evidence shows that before the incorporation of the Health Culture Company, relator owned and operated a sanitarium known as Dr. Ball's Health School. At that time paid runners met all incoming trains and solicited business for the sanitarium.

Later the Health Culture Company was organized. Its subscribed capital stock was paid up by transferring to it, relator's sanitarium, its property and equipment. Relator is president and his wife is secretary of the corporation and together they owned ninety-three per cent of its stock. After the incorporation of the Health Assurance Association, relator has continued to operate the sanitarium, direct and control its policies and solicit business for it by paid agents exactly the same as he did before the incorporation of the Health Culture Company.

This evidence warrants the conclusion that the Health Culture Company was a corporation in name only; that relator was in fact the owner and operator of the sanitarium and was attempting to use the charter of the corporation as a shield to cover his own private activities. This view is strengthened by the evidence of witnesses that relator told them that a doctor's license could be revoked for soliciting business; that he might sometime be charged with soliciting business, and to avoid such a charge, he had the solicitor's city license issued in the name of the Health Assurance Association. Our conclusion is that relator and not the corporation was, in fact, operating the sanitarium.

Our next question is whether the soliciting was for board, rooms and baths or for treatments. Relator was asked why he had paid runners soliciting business. His answer was: "We were driven to it, according to our conception, to prevent business we were getting and was being sent to us and we were bringing in being sold and diverted to other doctors."

Relator's wife testified that soliciting was made necessary on account of other doctors having solicitors and getting patients which should come to them; that the thing they were interested in was getting people to their place who wanted to take treatment and service. She further testified that approximately one-third of their business was brought in by solicitors.

Witnesses who worked as solicitors testified that relator instructed them to solicit people for private rooms and board instead of soliciting them for the Health School if they could get more people by so doing, and when people accepted solicitation for private rooms and board to take them to his office at the school, instead of taking them to a private room. One of these solicitors testified:

"Q. I will ask another question. Just state what Dr. Ball said to you at different times with reference to the solicitation of people to go to a rooming house instead of a Health Culture School? A. Well, his purpose as he explained it to me in getting one or two rooming houses aside from the institution was to make it possible to legally solicit for rooming houses and light housekeeping rooms in order to get hold of these folks at the depot without arousing their suspicions

as to just where they might be taken after they were gotten into the cab; the idea is that a lot of them probably wouldn't want to go to an institution or sanitarium and by soliciting for rooms or private housekeeping places, you would get around that.''

Another solicitor testified that he would ask a prospect if he wanted a private place to stop and if he accepted, he would ''put him in a car and take him up for Dr. Ball, and Dr. Ball would take his case history and examine him and land him if he was a good case.'' This witness further testified that his manner of getting business was directed by relator.

On the other hand relator testified that he instructed the solicitors to first ascertain if visitors were intending to go to Dr. Ball's Health School, and if they did not so intend, then solicit them for board, room and bathing facilities, but never, under any circumstances, to solicit them for professional services. He also testified that he would not have used solicitors but for the fact that other solicitors were getting people that intended to come to his place.

The conflict in the evidence as to the purpose of the soliciting presented an issue of fact for the determination of the board and warranted the conclusion that relator, through paid agents, was soliciting patients to be treated.

Further contention is made that all patients coming to the sanitarium were treated by osteopath physicians in the employ of the Health Culture Company, and not by relator. From this it is argued that if the purpose of the soliciting was to get patients for treatment, no law was violated, because there is no statute or rule prohibiting the soliciting of patients for osteopathic treatments.

There is evidence that relator examined and prescribed for patients coming to the sanitarium for treatment. One witness testified that usually relator was the first one to see patients coming to the institution; that he would inquire into their condition and give them a physical examination. This witness further testified that there was a large stock of drugs in the institution and that relator wrote prescriptions and prescribed medicine for patients practically every day. Another witness, George J. Sedar, a patient in the sanitarium, testified that relator gave him a physical examination and prescribed both medicine and a diet for him. On cross-examination, this witness testified:

''Q. Your medical treatment was administered by Dr. Mitchell, wasn't it? A. Sometimes; sometimes by Dr. Schenick and usually on Dr. Ball's prescription, just as he wrote on there. I had several of those written by Dr. Ball, which I would take down to the treatment room and give over to Doctor Schoen and Doctor Mitchell; sometimes over to Doctor Levine.''

There was other evidence that relator examined patients coming to the sanitarium for treatment. The advertisement sent out by Dr. Ball's Health School names Dr. S. E. Ball as Director and Chief of Staff of the largest non-surgical institutional staff of specializing physicians in the middle west.

It is true the evidence of relator and the witnesses offered by him tended to show that relator did not examine, prescribe for or treat patients, but evidently the board did not believe this testimony in the face of substantial evidence to the contrary. Viewing the evidence as a whole, it warranted the conclusion that relator was practicing medicine and that he solicited patronage by agents within the meaning of Section 7336, Revised Statutes 1919.

The final contention is that the order of the board revoking relator's license is void for two reasons, (1) because the board did not find relator guilty of soliciting patronage by agents, that is, the record does not affirmatively show that a majority of the members of the board were satisfied that relator was guilty of such charges, and (2) because the order does not fix the period of time for which the license was revoked. The statute pertinent to this contention provides:

"If a majority of the members of the board are satisfied that the licentiate is guilty of any of the offenses charged, the license shall be revoked for such period of time as may be agreed upon."

This statute does not require that the record of the board must affirmatively show that a majority of the board found relator guilty of the offense charged: The only action the board is required to take is to *revoke the license* in event a majority of the board is satisfied that the licentiate is guilty of the offense charged. The record in this case shows that relator had notice of the charges preferred against him, appeared in person and by counsel, offered evidence in his own behalf and cross-examined the witnesses appearing against him. Six of the seven members of the board were present, heard all the evidence and unanimously voted to revoke relator's license, and an order to that effect was entered of record. In this situation, it must be presumed that the board obeyed the mandate of the statute and revoked the license because it was satisfied from the evidence heard that relator was guilty of the offense charged against him. The members of the Board of Health are public officers and are presumed, in the absence of a contrary showing, to have performed their duty in accordance with the law. [State ex rel. Johnson v. Clark, State Board of Health, 232 S. W. 1031-33-34, 288 Mo. 659.]

In addition to the foregoing, it may be said that an investigation by the State Board of Health is not a lawsuit, and the technical rules of procedure applicable to a judicial trial need not be followed. In State ex rel. v. Goodier, 195 Mo. 551, 559, 93 S. W. 928, we said:

50

"The State Board of Health is not a court, is not a judicial tribunal; it can issue no writ, it can try no case, render no judgment; it is merely a governmental agency, exercising ministerial functions; it may investigate and satisfy itself from such sources of information as may be attainable as to the truth or falsity of the charges of misconduct against one holding one of its certificates, but its investigation does not take on the character of a judicial trial. . . . To guard and protect the health and welfare of its people the State must have its ministerial agents or officers and intrust them with power; if every administrative act that looks to the enforcement of the law should be required to be reduced to the compass of a lawsuit and be put into effect only after a court had at the end of a formal trial stamped its judgment upon it, the government would make slow progress."

For the reasons stated, we hold that it was not necessary for the record to affirmatively show that the board found relator guilty of the offense charged, as a prerequisite to the order revoking the license. Neither do we think that the order revoking the license is void because it does not state a period of time for which the license was revoked. The statute provides that the license shall be revoked for such period of time as may be agreed upon. The members of the board may agree to revoke for a limited period of time or for all time, and where, as here, the order revoking the license does not name any specified period of time, it necessarily means a permanent revocation for all time.

It is our conclusion that the action of the State Board of Health revoking relator's license to practice medicine and surgery in this State should be sustained, and the judgment of the Circuit Court of Caldwell County quashing such proceedings and ordering said board to restore relator's license, should be reversed. It is so ordered. All concur, except *Blair, J.*, who dissents in separate opinion, and *Walker, J.*, absent.

BLAIR, J. (dissenting).—While I think that the disposition made of the merits of the case in the majority opinion is correct in the main, I am still of the opinion, as I was on the first appearance of the case, that the State Board of Health did not make a sufficient finding of the guilt of relator, as required by Section 7336, Revised Statutes 1919, to authorize it to revoke relator's license to practice medicine in this State.

Counsel and the parties are familiar with my views as expressed in an opinion heretofore written. As the reasons there outlined, which I still regard as sound, constitute only an elaboration of the reason for my present inability to concur in the result reached by the majority of the court, I see no necessity for restating them now.

I most respectfully dissent.