Virgil A. BITTIKER, D.O., Respondent,

v.

STATE BOARD OF REGISTRATION FOR the HEALING ARTS, Appellant.

No. 24459.

Kansas City Court of Appeals.

Missouri.

June 14, 1966.

Norman H. Anderson, Atty. Gen., Jefferson City, Albert J. Stephan, Jr., St. Louis, for appellant.

Reed Gentry, Rogers, Field & Gentry, Kansas City, William B. Waters, Hale, Coleberd, Kincaid & Waters, Conn Withers, Liberty, for respondent.

BLAIR, Judge.

■ Virgil A. Bittiker, an osteopathic physician, was charged by the State Board of Registration for the Healing Arts with "soliciting patronage", in violation of Sec. 334.100, subsec. 1(9) V.A.M.S., "through the Excelsior Medical Clinic, Incorporated", by means of advertisements "placed by said corporation" in national magazines and, after hearings, he was declared guilty of all charges and his license to practice the healing arts was revoked. He filed his petition for review in the Circuit Court of Clay County (Chapter 536, V.A.M.S.) which "reversed, set aside and held for naught" the findings and order of the board. The board appeals. We have jurisdiction. Gaddy v. State Board of Registration for Healing Arts, Mo., 394 S.W.2d 284.

■ Sec. 334.100, subsec. 3, provides that a physician "whose license is revoked or suspended by the board shall have the right to have the proceedings reviewed as provided by law for the review of decisions, rules and regulations of administrative officers and bodies existing under the constitution and laws of this state." The review required here is that ordered by Art. V, Sec. 22, Const. of 1945, V.A.M.S., as implemented by Sec. 536.140 V.A.M.S. Gaddy v. State Board of Registration for Healing Arts, Mo.App., 397 S.W.2d 347; State ex rel. St. Louis Public Service Co. v. Public Service Commission, 365 Mo. 1032, 291 S.W. 2d 95. The circuit court had, in the first instance, as this court has, in this instance, the duty to determine, on the entire record, whether the board reasonably could have made the findings and issued the order we now review. Yet neither the circuit court nor this one has any authority to substitute its own judgment for the judgment of the board, if the board's findings and order are supported by substantial evidence, unless the action of the board is clearly contrary to the overwhelming weight of the evidence viewed in its entirety, together with all legitimate inferences which flow reasonably from that evidence in the light most favorable to the action of the board. Rush v. Swift & Co., Mo.App., 268 S.W.2d 589; Willens v. Personnel Board of Kansas City, Mo.App., 277 S.W.2d 665; Carroll Const. Co. v. Kansas City, Mo.App., 278 S.W.2d 817; Brown v. Anthony Mfg. Co., Mo., 311 S.W.2d 23.

■ The old doctrine that statutes regulating and disciplining physicians must be construed strictly against the board and liberally in favor of the physician under investigation has long since been repudiated. The "(P)owers conferred on boards of health", said the Supreme Court in 1928, "to enable them effectually to perform their important functions in safeguarding the public health should receive a liberal construction. * * * While boards of this character cannot act arbitrarily, or without substantial evidence (State ex rel. v. Adcock, 206 Mo. 550, loc. cit. 558, 105 S.W. 270, 121 Am.St.Rep. 681), yet, when any act, requiring the exercise of judgment and the employment of discretion, is within the scope of the exercise of a reasonable discretion, it will not be interfered with." State ex rel. Horton v. Clark, 320 Mo. 1190, 9 S.W.2d 635, 638. These statements were approved in State ex rel. Lentine v. State Board of Health, 334 Mo. 220, 65 S.W.2d 943, 950, with the observation that examining the "object of our Medical Practice Act as a whole, we find it to be an exercise of inherent police power of the state in the protection of its people attempting to secure to

the people the services of competent practitioners learned and skilled in the science of medicine, of good moral character and honorable and reputable in professional conduct." Earlier decisions prescribing strict construction were disapproved and liberal construction was declared to be the rule. In Hughes v. State Board of Health, in 1942, 348 Mo. 1236, 1240, 159 S.W.2d 277, 279, the court noticed that, long prior to the decisions upholding strict construction, it had held that "the medical practice act was enacted in the interest of society, State v. Hathaway, 115 Mo. 36, 21 S.W. 1081," and declared that the primary purpose of a proceeding to revoke a physician's license is to safeguard the public health, not to punish the physician. Again the court declared that the old doctrine of strict construction was dead.

 Statutes authorizing the board to regulate and discipline physicians are remedial statutes enacted in the interest of the public health and welfare and must be construed with a view to the suppression of the wrongs and the mischiefs undertaken to be remedied. State ex rel. Lentine v. State Board of Health, supra, 65 S.W.2d l. c. 950; 26 Mo.Digest., Stat., Nontechnical words and phrases must be given their "plain or ordinary and usual sense." Sec. 1.090 V.A.M.S. Gaddy v. State Board of Registration of Healing Arts, Mo.App., 397 S.W.2d 347.

 Sec. 334.100, subsec. 1(9), authorizes the board to revoke the license of any physician for: "Soliciting patronage in person or by agents or representatives, or by any other means or manner, under his own name or under the name of another person or concern, actual or pretended." Even strictly construed, as it must not be, it is difficult to imagine a prohibition more all-inclusive and pervasive than this one. What the General Assembly obviously sought to prevent was "soliciting" patronage, that is, patients, by physicians, by any means or in any manner, overt or covert, directly or indirectly, through his own personal contacts and efforts or by standing behind any other "person or concern", "actual or pretended", doing it for his benefit and with his approval and cooperation while he serves as the willing beneficiary. A sweeping prohibition was written by the General Assembly, one excluding all possible escape hatches the unethical physician might endeavor to employ.

 The word "soliciting" is not a word of technical meaning as it is employed in this statute, although it is urged on us that we should view it in that light. This we decline to do. Legal and standard dictionaries and court decisions from various jurisdictions are cited to us. One cited definition of the meaning of "solicit", fairly illustrative of others cited, is to "make petition to; to entreat; importune, as to solicit the king for relief; now often to approach with request or plea, as in selling, begging, etc." Certainly the archaic first part of this definition does not portray the "plain or ordinary and usual sense" of the word "soliciting" in these modern days. Sec. 1.090 V.A.M.S. The latter part of the definition more nearly does. We have no hesitancy in declaring that all professional persons, legislators and men in the street would regard the word "soliciting", in the context of this statute, as meaning to ask for or to request some thing or action in language which convinces that the asking or requesting is being done in earnest and that the solicitor wants results. Webster's International Dictionary gives, among other modern definitions, the meaning of the word "solicit" as: "To awake or excite action; to rouse a desire in; to summon; to appeal to; to invite; allure. To endeavor to obtain by asking or pleading. To urge the claims of; to advocate." These common definitions express, in our view, the "plain or ordinary and usual sense" of the word "soliciting", as employed in the statute, and answer negatively beyond all argument, that it is a word of technical meaning.

Counsel for the licensee argue that physicians are permitted to "advertise" by the

terms of Sec. 334.047, subsec. (2) V.A.M.S. enacted simultaneously with Sec. 334.100, subsec. 1(9). Sec. 334.047, subsec. (2) declares: "A licensee under this chapter shall, in any letter, business card, *advertisement*, prescription blank, sign, or public listing or display of any nature whatsoever, designate the degree to which he is entitled by reason of his diploma of graduation from a professional school approved and accredited as reputable by the American Medical Association or approved and accredited as reputable by the American Osteopathic Association." (Emphasis supplied)

▮ Counsel seem to take the view that the authority to advertise, condoned and limited by Sec. 334.047, subsec. (2), awards to physicians the right to advertise to accomplish almost any object they may desire. We reject this construction of the statute. The licensee's conduct cannot be weighed on this scale. By Senate Bill 50, Laws of Mo., 1959, the General Assembly repealed Chapters 334 and 337 RSMo 1959, as they then stood, and enacted a new code on the subject we are considering and on other related subjects. The code appears in full as Chapter 334, V.A.M.S., 1965 Cumulative Annual Pocket Parts. The sections we are considering constitute a part of the entire code. All were enacted at the same time. All are therefore in *pari materia* and they must be read and construed together. Effect must be given to all provisions. Apparent conflicts must be harmonized whenever possible. Mitchem v. Perry, Mo.App., 390 S.W.2d 600, Hull v. Baumann, 345 Mo. 159, 131 S.W.2d 721, 725.

▮ Surely the General Assembly did not mean to denounce "soliciting", by the all-inclusive and pervasive language of great strength and sweep it employed, and then, by means of Sec. 334.047, subsec. (2), authorizing circumspect and limited advertising, to annul its denunciation of "soliciting" by allowing it to be done without hindrance as advertising. For us to adopt this construction would be to convict the General Assembly of intending the absurd, something we must avoid if we can do it by any other reasonable construction. 26 Mo. Digest, Stat., ▮ This we do without any dubiety, logical or legal. For while it is true that all advertising is not necessarily "the soliciting" proscribed by Sec. 334.100, subsec. 1(9), it is necessarily just as true that the proscribed "soliciting" can easily take the form of advertising. It is idle to engage in semantics that cannot absolve a solicitant. Of course, the clinic's program was one of advertising, as the licensee says, and of course, as it will appear, its advertising was also a program for the solicitation of prospective patients.

▮ We need not concern ourselves in this case with locating the precise line of demarcation between the circumspect and limited advertising permitted by Sec. 334.-047, subsec. (2) and the "soliciting" proscribed by Sec. 334.100, subsec. 1(9), for the soliciting here, as we will develop, was so egregious and gross, and so far on the wrong side of any defensible line of demarcation between the permissible advertising and forbidden soliciting, that we will leave to closer cases the placement of the exact line a physician cannot overstep. Moreover, the argument that any solicitation must be a "personal petition and importunity addressed to a particular individual" is so completely and forcefully answered by the very language of Sec. 334.100, subsec. 1(9) itself that we withhold answering it further than to say that the General Assembly, as was its right, has declared an altogether different definition and policy than the one we are asked to adopt.

We have examined all of the decisions cited by the licensee and we see none that supports any of his theories in the face of our strong statutes. Ketring v. Sturges, Mo., 372 S.W.2d 104; State ex rel. Ball v. State Board of Health et al., 325 Mo. 41, 26 S.W.2d 773; State ex rel. Horton v. Clark et al., 320 Mo. 1190, 9 S.W.2d 635; State ex inf. Sager v. Lewin et al., 128 Mo.

App. 149, 106 S.W. 581; Sapero v. State Board of Medical Examiners, 90 Colo. 568, 11 P.2d 555; Carter v. State, 81 Ark. 37, 98 S.W. 704; Golden & Co. v. Justice's Court of Woodland Tp., Yolo County, 23 Cal.App. 778, 140 P. 49; In re Owen, 207 N.C. 445, 177 S.E. 403; Rust v. Missouri Dental Board, 348 Mo. 616, 155 S.W.2d 80; State v. Cusick, 248 Iowa 1168, 84 N.W.2d 554. An analysis to demonstrate their inapplicability would uselessly prolong this opinion to no real purpose.

Substantial evidence in the record before the board, the circuit court and this court follows. M. C. Salmon testified: The Excelsior Medical Clinic, a corporation, practices medicine in Excelsior Springs, Missouri. It specializes in the treatment of "prostate gland, rectal and hernia conditions." He is its president. At all relevant times the licensee was its vice-president, one of its stockholders, a member of its four member board of directors, one of its 5–7 physicians examining and treating its patients, "its highest paid physician on the staff", and its chief of staff exercising supervisory control over all other physicians, and all examinations and treatments.

For years the clinic has been advertising in national magazines the efficacy of the non-surgical treatment it claims to be able to render to those suffering from prostate gland, rectal and hernia conditions. Through an advertising agency it procures placement of its advertising, after weekly advance conferences with the agency, in various magazines, Popular Mechanics, Farm and Ranch, Stag, Saga and Male Magazine. At all relevant times it advertised in these magazines, Farm and Ranch and Popular Mechanics Magazines in the October, 1963 issues, Stag Magazine in the December, 1963 issue and Saga and Male Magazines in the January, 1964 issues. Summarization cannot convey the full import of these advertisements but the reproduction of one appearing in Popular Mechanics Magazine, October, 1963 issue, ought to portray adequately the purpose of the advertising done by the clinic by means of the advertisements mentioned in the charges:

# MEN PAST 40

### Afflicted With Getting Up Nights, Pains in Back, Legs, Nervousness, Tiredness

If you are a victim of these symptoms, your trouble may be due to Glandular Inflammation— a constitutional Disease that requires special types of medical treatment. Neglect of such Inflammation may cause men to grow old prematurely and often leads to Incurable conditions.

Most men, if treatment is taken in time, can be successfully NON-SURGICALLY treated for Glandular Inflammation. If the condition is aggravated by lack of treatment, surgery may be the only chance.

## NON-SURGICAL TREATMENTS

The NON-SURGICAL treatments used at the Excelsior Medical Clinic are the result of discoveries in recent years of new techniques and drugs, plus over 20 years research by scientific technologists and doctors.

Men from all walks of life and from over 1,000 communities have been successfully treated here at Excelsior Springs. They found soothing and comforting relief and better health.

**EXAMINATION AT LOW COST**

When you arrive, our Doctors, who have years of experience in this field, make a complete examination. You then decide if you will take the treatments needed, which are so mild, hospitalization is not needed.

**REDUCIBLE HERNIA**
Is also amenable to a mild Non-Surgical Treatment available here.

**RECTAL-COLON DISORDERS**
are often associated with Glandular Inflammation.

Either or both of these disorders may be treated at the same time you are receiving Glandular Inflammation Treatments.

**Write For FREE BOOK**

The Excelsior Medical Clinic has published a New FREE Book that deals with diseases peculiar to men. It could prove of utmost importance to you. Write today. No obligation.

NON-SURGICAL TREATMENT of DISEASES

**EXCELSIOR MEDICAL CLINIC**
Dept. B6151
Excelsior Springs, Mo.

Gentlemen: Kindly send me at once, your New FREE Book. I am interested in full information. (Please Check Box)

☐ Glandular Inflammation ☐ Hernia ☐ Rectal-Colon

Name.....................................

Address..................................

City.................... State.............

M. C. Salmon was in charge of "the business end of the operation" of the clinic, including its advertising and correspondence. When a reader of one of the magazine advertisements responded by writing for information about the treatment afforded by the clinic, he was sent "a brochure and a letter of transmittal explaining what it is" together with a questionnaire. Salmon received these answered questionnaires when they arrived at the clinic. He might "consult on a questionable case with any member of the staff", including the licensee, concerning responses to be made to the answered questionnaire. Then he wrote letters to the prospective patients, "200 possibly every week", reminding them of their need for early non-surgical treatment if they were to avoid the need for future surgical treatment and offering to send them a list of former patients whom they could contact for information about the efficacy of the treatment. When patients arrived at Excelsior Springs, he made arrangements for their transportation to hotels and for their hotel accommodations. Then the staff took over and examined and treated the patients according to the practices of the clinic under the supervision of licensee as chief of staff.

Viewing this background, we examine the conduct of the licensee. The charges against him were five in number.[1] By his own testimony he condemns himself. Called by the board as an adverse witness by authority of Sec. 536.070, subsec. (3), V.A. M.S., (he did not volunteer to testify), he answered under oath: During the period September 1, 1963 through January, 1964, he

was vice-president and a member of the board of directors of the corporation which was the clinic. Its "principal business" was the practice of medicine. He was also chief of staff. His duties were "supervision of examination and treatment of patients". He stood in "a supervisory position over other physicians there". He had served in that capacity continuously since 1958. During 1963 the clinic treated "approximately two thousand" patients. For his services he received a monthly salary from the clinic. He also received dividends on his stock which were voted by the board of directors, of which he was one of four members. His only office was at the clinic and the practice of his profession was "devoted exclusively to practicing as chief of staff" of the clinic. He had no private patients, only the clinic's patients. He did not examine or treat every patient of the clinic, but he examined as many as he could and prescribed for them. "Obviously, when there is a great number, I have to have assistance." The number of the clinic's patients varied from seventy-five to one hundred fifty. He had nothing to do with the correspondence with prospective patients or with the clinic's advertising program. This business of the clinic was all managed by Salmon.

Shown the advertisement placed by the clinic in Stag Magazine, December issue 1963, which was similar in essential respects to the one set forth above and the others mentioned in the charges, he was asked if he had seen ads like that before. He answered, "Yes, I have." "Q. You are aware of the fact that those ads are placed by the clinic are you not? A. Yes, sir. Q. And

---

1. "1. That you did, by and through the Excelsior Medical Clinic, Incorporated, solicit patronage by means of an advertisement placed by said corporation in the October 1963 issue of *Farm and Ranch* magazine. 2. That you did, by and through the Excelsior Medical Clinic, Incorporated, solicit patronage by means of two advertisements placed by said corporation in the October 1963 issue of *Popular Mechanics* magazine. 3. That you did, by and through the Excelsior Medical Clinic, Incorporated, solicit pa-tronage by means of an advertisement placed by said corporation in the December 1963 issue of *Stag* magazine. 4. That you did, by and through the Excelsior Medical Clinic, Incorporated, solicit patronage by means of an advertisement placed by said corporation in the January 1964 issue of *Saga* magazine. 5. That you did, by and through the Excelsior Medical Clinic, Incorporated, solicit patronage by means of an advertisement placed by said corporation in the January 1964 issue of *Mule* magazine."

I presume you were so aware during the period in question, September (1963) through January (1964)? A. Yes, sir." An offer was made to let him examine all the advertisements embraced in the charges against him. The record does not show whether he availed himself of this offer or brushed it aside as needless, but his testimony in this regard was as follows: "Q. But these ads which were marked in evidence at the last hearing—you are certainly free to examine all of them—don't come as a surprise, do they, sir? A. Oh, no, I have known that the clinic advertises. It is public knowledge. Q. Was that the situation in 1958 when you—A. Always, always. Q. Always? A. Always. Q. And it still is the situation now? A. Still."

■ Despite all of this evidence, and particularly the admissions of the licensee, it is argued that he was not guilty of soliciting because "all of the evidence conclusively proved that Dr. Bittiker did not *procure* the Clinic advertising by any *direct* or *indirect* means and, therefore, the charges were *disproved* by the evidence." (Emphasis supplied.) There is no claim that he personally procured the placement of the advertisements. He was charged with soliciting patients by means of advertisements placed by the clinic in national magazines. This he could do either "in person or by agents or representatives, or by any other means or manner, under his own name or under the name of another person or concern, actual or pretended". Sec. 334.100, subsec. 1(9). Did he do this? The advertisements were palpable solicitations designed to attract patients to the clinic for examination and treatment by the licensee and his staff. By his own admission he knew that the advertising was being done and that the advertising program of the clinic was "public knowledge". He knew that the advertising had been going on since he became chief of staff in 1958 and "always, always", and that it was "still" going on. From every point of view, and in the logic of this whole atmosphere, how can we say, without blinding our eyes to the obvious, that the licensee did not consciously engage in the clinic's general scheme to solicit patients for him to examine and treat? With his knowledgeable cooperation, the clinic's whole operation was made complete. He chose to be the physician completing that operation. He accepted the patients when they arrived and examined and treated them for the clinic. He knew the source of those patients and he connived at it for personal gain and aided and abetted in the consummation of the whole operation. He wants us to hold, as he repeats he earnestly believes, that he merely examined and treated the clinic's patients, meanwhile standing professionally aloof and innocent of the clinic's program of solicitation. No doubt he beguiled himself into the belief that this was true and that it absolved him from complicity. This will not do. He could not lurk behind the corporate shield and profess a naivete beneath the intelligence of everyone of average intelligence. Nor is this court required to profess an ignorance of things which obtrude themselves on the ready understanding of all men. He could not consciously become a participant in the general scheme and accomplish indirectly through the clinic what he could not do directly by himself and then successfully declare himself exempt from complicity. The very terms of Sec. 344.100, subsec. 1(9) plainly forbade his conduct. This is true under any construction of this statute, liberal or strict. Although the decisions we now cite are not precisely in point on the facts, they approach this case nearly enough and they announce the philosophy we have announced as the one governing this case. See: State Dentists v. Gifford, 168 Va. 508, 191 S.E. 787, 788; Lasdon v. Hallihan, 377 Ill. 187, 36 N.E.2d 227, 231; Basford v. Department of Registration and Education, 390 Ill. 601, 62 N.E.2d 462, 465; Application of Sternfels, 20 A.D.2d 840, 248 N.Y.S.2d 173, 175.

■ For his conduct the licensee must take the consequences. By his conduct in consciously becoming a participant in the general scheme of the clinic and in aiding

and abetting it in its program of soliciting patients for him to examine and treat, he has betrayed his trust as a physician and for this reason he is no longer a physician. He has left us with no alternative but to hold that the findings and order of the State Board of Registration for the Healing Arts are supported by substantial evidence and are entirely consistent with the clear weight of the evidence. We so hold.

The judgment of the circuit court was plainly erroneous. It is reversed and this cause is remanded with our direction to reinstate the board's findings and order.

HOWARD, J., and COOK, Special Judge° concur.

CROSS, P. J., not participating.