Virginia LONG, Plaintiff–Appellant,

v.

ST. JOHN'S REGIONAL HEALTH CENTER, INC., Defendant–Respondent.

No. 24857.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 22, 2003.

Petition for Rehearing and Transfer Denied Feb. 13, 2003.

Application for Transfer Denied April 1, 2003.

Thomas G. Morrissey, Law Office of Gary Green, Springfield, for appellant.

Michael J. Patton, Jeffrey T. Davis, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, for respondent.

JAMES K. PREWITT, Presiding Judge.

Virginia Long ("Long") appeals from a judgment in favor of St. John's Regional Health Center, Inc. ("St.John's") in a negligent health care/personal injury action. Long's two points relied on address the trial court's ruling allowing the admittance of a particular exhibit and St. John's use of a portion of that exhibit to impeach her with a prior inconsistent statement.

In January 1997, Long was hospitalized as a surgical patient at St. John's for treatment of an abdominal aortic aneurysm. On or about January 21, 1997, Long fell in her room at St. John's and fractured her left hip. The circumstances that led to the fall were at issue at trial. All parties agreed that, prior to the fall, Long had been instructed to call for a nurse if she needed to get out of her bed to go to the

bathroom. Long testified that on the night of the fall, she had followed those instructions and called for a nurse, who assisted her from the bed to the bathroom. According to Long, the nurse told her to pull the cord in the bathroom when she finished, which Long testified she did, but that after waiting anywhere from five to fifteen minutes, no nurse had come to assist her back to the bed. Long attempted to pull the cord a second time, waited a minute or two, and then started back to her bed without assistance. Long had an IV in her left arm and as she reached the foot of the bed, the IV pole hit something and stopped rolling, and Long fell.

St. John's provided a different version of the events that led to the fall. A nurse's assistant on duty that night at St. John's, Deborah Baldwin ("Assistant"), testified that Long called for assistance on two occasions prior to her fall. The first was to assist Long to the bathroom and the second time was to close the door to her room. When Assistant assisted Long to the bathroom, Long complained of being dizzy; because of that, Assistant specifically instructed her to call for assistance and Long promised that she would not get up without so calling.

One of the supervising registered nurses on duty that night was Sara Korman ("Supervisor"), who at that time was known by her maiden name of Scroggs. According to Supervisor, Long's roommate stuck her head out of the door and said, "We need help in here." Supervisor entered the room and found Long laying toward the foot of her bed. When Supervisor asked Long how she had fallen, Long told Supervisor that "she needed to go to the bathroom [and] ... had gotten up without calling for assistance." Supervisor further testified that Long told Supervisor that, "She didn't want to bother us.... When she got up to walk to the bathroom, she

said she had forgotten she had the IV. When she started to walk, her IV tubing pulled tight, and she lost her balance and that's when she fell."

Assistant, who accompanied Supervisor into the room, testified to similar statements from Long stating that, "She told me she was going to the bathroom." Assistant also indicated that, based on the way Long was lying on the floor, it was Assistant's conclusion that she had fallen while on her way to the bathroom.

Long sustained a fractured hip, which was surgically repaired the same day as the fall with a femoral prosthesis. She received therapy for the injury and, after release from St. John's, she stayed at the Lake of the Ozarks Extended Care for twelve to fourteen days under the care of Dr. Chris Leslie, an orthopedic surgeon.

Long filed the first amended petition in the case on September 27, 2001. The parties filed a joint stipulation on November 20, 2001, which indicated that all of Long's medical records were considered business records. The jury trial was held November 26–28, 2001.

During St. John's cross-examination of Long, she denied there was any discussion in the room about how she fell. Long was then asked whether she had told any other doctors how she fell, specifically Dr. Leslie. A bench conference was held that addressed the propriety of using Exhibit J–3, which was a medical record entry authored by Dr. Leslie on January 30, 1997 after Long had been transferred to the Lake of the Ozarks General Hospital. The pertinent part of the entry is as follows:

> The patient states that she had recently been hospitalized in Springfield for treatment of an abdominal aortic aneurysm. She had undergone this operative repair and when she was being helped up to go to the bathroom, she

states they "dropped me" and she fell to the floor suffering a fracture of her left hip.

Long's counsel objected to this portion of Exhibit J 3 on hearsay grounds, arguing that the statements in the entry were not necessary for treatment or diagnosis and thus, not admissible. St. John's argued that the intended use of the exhibit was to confront Long with statements that were contrary to her testimony. The trial court agreed with St. John's and ruled that the statements were "not even offered for the truth" and thus, appropriate for use as prior inconsistent statements. Therefore, since Long's credibility was at issue, the statements could be used to impeach her.

Regarding the admission of the exhibit into evidence, the trial court ruled that if Long admitted making the statements attributed to her in Exhibit J–3, the document itself was not admissible and would not be received. However, if Long denied making the statements, the document was admissible for use as impeachment and could then be displayed to the jury.

Counsel for St. John's continued the cross-examination of Long:

Q [by counsel for St. John's]: Ma'am, when you met with Dr. Leslie, ... did you tell him that when you were being helped up to go to the bathroom, that they, St. John's employees, dropped you and you fell to the floor, suffering a fracture of your left hip?

A [by Long]: No, I always said they let me fall, and I do believe, maybe that's a poor description, but that was the way— if someone asked me, I said they let me fall at the hospital.

Q: My question is, did you tell him—

A: No.

Counsel proceeded to show the exhibit to Long and the jury and took her through the various statements in the entry, and she admitted making some of the statements, but denied telling Dr. Leslie that she was dropped by St. John's employees when she was being helped up to go the bathroom. Following re-cross, St. John's offered the exhibit in question, which the trial court admitted, acknowledging that it was being received over Long's objection to both showing it to the jury and admitting it into evidence.

In its judgment filed November 30, 2001, the trial court specified the jury's verdict against Long and in favor of St. John's. In her motion for new trial, Long claimed that the trial court erred in admitting Exhibit J–3 and allowing St. John's to cross-examine Long about its contents. Long argued that the entry did not fall within a hearsay exception as it was not necessary for the purposes of treatment and diagnosis, and that the admission was prejudicial because the entry contained details of the matter in controversy. Following the denial of the motion, this appeal followed.

In her two points on appeal, Long contends that the trial court erred in allowing St. John's to impeach her with Exhibit J–3, and in admitting the exhibit, without a proper foundation and over her objection. The basis of her argument in Point I is that the entry was hearsay because it did not qualify under the business record exception. For Point II, her argument is that entries in medical records do not qualify as non-hearsay prior inconsistent statements unless the statements are shown to have been made by the witness and to be a verbatim transcript of what the witness said. Due to the overlapping nature of the analysis of the two points, we will address them together.

The trial court has broad discretion in determining the admissibility of substantive evidence and in determining

the extent and scope of cross-examination, including the impeachment of a witness by use of a prior inconsistent statement. *Reno v. Wakeman,* 869 S.W.2d 219, 223 (Mo.App.1993). The trial court's rulings with regard to cross-examination will not be disturbed absent an abuse of discretion. *Darnaby v. Sundstrom,* 875 S.W.2d 195, 198 (Mo.App.1994).

Limitations exist on the trial court's discretion to control the extent and scope of cross-examination that seeks to elicit substantive evidence. *Reno,* 869 S.W.2d at 223. The trial court may not exclude relevant and material facts simply because counsel seeks to elicit such facts on cross-examination. *Id.*

The trial court's discretion regarding impeachment of a witness is also limited. *Id.* at 224. The trial court may not prevent cross-examination on a proper subject. *Id.* As a general rule, a witness may be asked any questions on cross-examination that tend to test accuracy, veracity, or credibility, or shake the witness' credit by injuring his or her character. *Id.* at 223. Where a witness' prior inconsistent statement relates specifically to a paramount issue in the case, the trial court does not have discretion to prevent the impeachment of the witness through use of that statement. *Id.* at 224.

In order to impeach a witness with a prior inconsistent statement, a proper foundation must be laid. *Nichols v. Preferred Risk Group,* 44 S.W.3d 886, 892 (Mo.App.2001). The witness first must be asked on cross-examination whether he or she made the statement, and then be given the opportunity to refresh his or her recollection of the statement and to admit, deny, or explain it. *Id.* The prior inconsistent statement must be quoted and the precise circumstances under which it was made be given. *Id.* at 892–93. Here, the record clearly shows that the proper foundation was made for use of the entry as a prior inconsistent statement.

In a civil trial, prior inconsistent statements are admissible not only for impeachment purposes, but, under certain circumstances, may also be used as substantive evidence. *Foster v. Catalina Industries, Inc.,* 55 S.W.3d 385, 393 (Mo.App. 2001). The form of the prior inconsistent statement does not matter. *Id.* In particular, a prior inconsistent statement of a witness who is available for cross-examination may be used as substantive evidence in a civil trial. *Phillips v. American Motorist Ins. Co.,* 996 S.W.2d 584, 593 (Mo. App.1999).

Relevancy and materiality of the hearsay evidence does, however, depend on whether it is offered as substantive evidence or for the purpose of attacking the witness' credibility. *Miller v. Engle,* 724 S.W.2d 637, 640 (Mo.App. 1986). Prior inconsistent statements may be admissible for the limited purpose of impeachment and relevant only to that extent, or they may constitute substantive evidence, in which event relevancy and materiality are tested on a different ground. *Id.* There is a lesser burden when the prior inconsistent statements are used strictly for impeachment purposes. *See Coulter v. Michelin Tire Corp.,* 622 S.W.2d 421, 433 (Mo.App.1981).

Here, as in *Miller,* there is no indication that the medical records of Dr. Leslie were offered to prove the truth of the statement that St. John's employees had dropped Long as she was being helped to reach the bathroom. *Miller,* 724 S.W.2d at 640. However, Dr. Leslie's entry was appropriate evidence for the jury to consider in deciding whether Long's testimony was credible. *See Id.*

Even if· the parties had not entered a stipulation regarding the evidentiary foundation of Long's medical records, there cannot be any dispute that medical records, including Dr. Leslie's, are admissible as business records. *Id.* Of course, no stipulation can cover statements that are otherwise excludable such as those that are self-serving, not necessary for treatment or diagnosis, or not covered by a hearsay exception.[1] *See id.*

However, the entry from Exhibit J–3 was admissible for the limited purpose of impeachment. Thus, all of Long's arguments relating to cases in which it has been established that statements relating to the facts and circumstances of an injury only apply under the medical records hearsay exception when such statements are pertinent to diagnosis and treatment are not pertinent to the analysis of the statements when used solely for impeachment of a witness' credibility. *See Groves v. Ketcherside,* 939 S.W.2d 393, 398 (Mo.App. 1996); *State v. Miller,* 924 S.W.2d 513, 515 (Mo.App.1996).

The trial court did not abuse its discretion in allowing St. John's to use the entry as a prior inconsistent statement for impeachment purposes or to admit it into evidence for the jury's consideration for that purpose. Long's first point is denied.

In addition to the same foundational arguments raised in Point I, Long contends in Point II that the trial court erred in allowing the use of the entry as a prior inconsistent statement because it did not qualify as such in that St. John's failed to show it was made by Long or was a verbatim transcript of what Long said.

Long's argument in Point II is based largely on two cases, *Tamper v. Schaper,* 748 S.W.2d 183 (Mo.App.1988) and *Meyers v. Southern Builders, Inc.,* 7 S.W.3d 507 (Mo.App.1999). In *Tamper,* the trial court refused to allow impeachment of a doctor's testimony with a memorandum that was authored by an employee of the business where Tamper worked. *Tamper,* 748 S.W.2d at 184. The appellate court determined that the trial judge was correct to disallow the use of the memorandum for impeachment because the memorandum was not shown to be a verbatim transcript of what the doctor said; in addition, according to the trial court, it contained hearsay and was likely that employee's interpretation of the doctor's remarks. *Id.*

In *Meyers,* the trial court considered a portion of the medical records that read: "This is a 43 year-old male who apparently was involved in a MVA at which time he was the rider of a motorcycle with a helmet, striking a vehicle at approximately 35 miles per hour." *Meyers,* 7 S.W.3d at 514–15. The trial court excluded, "striking a vehicle at approximately 35 miles per hour," and instructed counsel for Southern Builders, Inc., that Meyers could not be asked whether he had made such a statement unless counsel could show they had a prior inconsistent statement that was admissible in evidence. *Id.* at 515.

Southern Builders, the defendants in the case, appealed that ruling, citing cases in

---

1. Long argues in her brief that the portion of Exhibit J–3 at issue on appeal should have been excluded just as portions of another exhibit (Exhibit A) were redacted in which Supervisor detailed the circumstances of the fall. The trial court noted that Exhibit A was admitted without the redaction because the entry was not consistent with Supervisor's testimony regarding what Long said after the fall, the entry contained information of what Supervisor said happened but she did not observe the fall, the entry appeared self-serving, the entry did not contain information necessary for diagnosis, and no hearsay exception covered the statement. As shown in our analysis, we disagree with Long's argument of an analogy between Exhibits A and J–3.

which facts and circumstances of an injury may be admissible under the medical records exception only if the statements are used by medical personnel for purposes of diagnosis or treatment. *Id.* The appellate court indicated that Southern Builders misunderstood the meaning of those cases and that one major difference was that in *Meyers* there was no showing that the excluded portion was uttered by Meyers. *Id.*

The appellate court also referenced the bench conference at which Meyer's attorney noted that counsel for Southern Builders could ask Meyers whether he ever told anyone he was going 35 miles per hour, but that Meyers' answer would be no. *Id.* According to the appellate court, although the attorney's comment during the bench conference was not evidence that Meyers did not utter the statement, there was also no concession that Meyers had made the statement. *Id.*

■ Here, there was enough to show that Long had made the statements to Dr. Leslie and that the statements made were more likely a verbatim transcript of what Long said to Dr. Leslie, rather than simply Dr. Leslie's interpretation of her remarks. When Long was asked on cross-examination whether she had told Dr. Leslie that employees from St. John's had dropped her, she responded that she "always said they let me fall." She also admitted to making all other statements noted in Dr. Leslie's entry.

Long's Point II is denied.

The judgment is affirmed.

RAHMEYER, C.J., and SHRUM, J., concur.