Mark M. TENDAI, M.D., Appellant,

v.

MISSOURI STATE BOARD OF REG-
ISTRATION FOR THE HEAL-
ING ARTS, Respondent.

No. SC 86110.

Supreme Court of Missouri,
En Banc.

April 5, 2005.

Johnny K. Richardson, Jefferson City, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jane A. Rackers, Asst. Atty. Gen., Jefferson City, Glenn E. Bradford, Edward F. Walsh, IV, Kansas City, MO, for Respondent.

MICHAEL A. WOLFF, Judge.

This physician disciplinary action arose from Dr. Mark Tendai's care of S.G., an 18-year-old woman pregnant with her second child in 1992. The tragic outcome of her pregnancy was the delivery of a stillborn child with the umbilical cord wrapped around the baby's neck.

The Missouri State Board of Registration for the Healing Arts filed two complaints with the Administrative Hearing Commission seeking to discipline Dr. Tendai, a Springfield physician specializing in obstetrics and gynecology, based on his treatment of S.G. and another obstetrical patient, J.W. The commission determined that Dr. Tendai was not subject to discipline for his treatment of J.W. As to S.G., the commission concluded that there was cause for discipline under section 334.100.2(5)[1] for "gross negligence," "repeated negligence," "incompetency," and "conduct harmful to a patient."

After the commission's decision, the board imposed discipline that included a 60-day suspension from medical practice, a ban from the practice of obstetrics and a requirement that Dr. Tendai attend a course on medical documentation. Dr. Tendai appealed to the circuit court of Cole County, which entered judgment upholding the commission's decision and the board's discipline.

On appeal to this Court, Dr. Tendai raises numerous challenges to the statute under which he was disciplined, to the healing arts board's procedures and to the alleged disparity of treatment in the disciplinary process. Resolution of this appeal, however, involves principally the task of applying the disciplinary statute, in its plain and ordinary meaning, to the facts of this case and determining whether there was substantial evidence to support the commission's decision.

This Court concludes that the commission's decision under the disciplinary statute is not supported by substantial evidence in the record as a whole. The judgment is reversed.

**Facts and Procedural History**

S.G., 18 years old and pregnant with her second child in 1992, made 13 visits to Dr. Tendai's office between April and November 1992. During S.G.'s first visit, Dr. Tendai determined that S.G.'s due date was approximately November 27, 1992. During her periodic visits with Dr. Tendai,

---

1. Unless otherwise noted, all statutory references are to RSMo Supp.1992, which were the statutes applicable at the time of the events in question.

her pregnancy appeared to be normal until October 1992.[2]

On October 16, 1992, Dr. Tendai first became concerned that S.G.'s unborn baby was not growing adequately. Dr. Tendai suspected that the fetus had developed intrauterine growth retardation (IUGR), which would cause the fetus to stop growing. He testified that he discussed IUGR with S.G. and recommended that S.G. see a perinatologist, a physician specializing in late pregnancy complications. Dr. Tendai testified that S.G. "panicked" and refused to see a perinatologist. He also testified that he was unsure whether he observed a normal three-vessel umbilical cord or an abnormal two-vessel cord. A two-vessel cord is associated with birth defects. Dr. Tendai produced a "sticky note"[3] dated October 16 that reflected that he was aware that S.G.'s fetus might have a two-vessel cord; however, the flow chart completed by the doctor's office nurse after the October 16 visit indicates a three-vessel cord.

When the healing arts board's investigator obtained Dr. Tendai's office records for S.G., there was no reference to the doctor having referred S.G. to a perinatologist. Later, however, Dr. Tendai produced a "sticky note" dated October 16 that states that S.G. refused his advice to consult with a perinatologist.

S.G. testified that Dr. Tendai never told her she had IUGR, but that his nurse told her that she did and that the doctor probably would discuss it with her. S.G. testified that Dr. Tendai told her the fetus was smaller than it should have been and that he was adjusting S.G.'s due date to early December 1992 for that reason. S.G. felt that Dr. Tendai would have discussed this in more detail with her if he had thought it was a serious problem. S.G. testified that Dr. Tendai never referred S.G. to a perinatologist or suggested that S.G. have any additional testing.

When Dr. Tendai saw S.G. again on November 2, 1992, the fetus had not grown since the prior visit. This strengthened his belief that the fetus had IUGR. At the doctor's request, S.G. went to the hospital for an ultrasound. The ultrasound confirmed Dr. Tendai's diagnosis of IUGR and also confirmed a two-vessel umbilical cord. During the ultrasound, S.G. was told that her fetus weighed approximately three pounds and that it would be up to Dr. Tendai whether he would continue to monitor S.G. or send her to a specialist.

Based on the testimony of expert witnesses, the hearing commission found that the proper treatment for IUGR was amniocentesis and non-stress testing. These procedures would not make the fetus grow, but could be used to monitor the fetus to determine whether and when birth should be induced or a caesarian section performed. Non-stress testing would determine the fetus' reaction to certain stimuli and would indicate whether the fetus was receiving adequate oxygen. Amniocentesis would reveal the lung maturity of the fetus to determine whether the baby could survive after delivery. Dr. Tendai did not have equipment to perform either amniocentesis or non-stress testing. Like the majority of obstetricians in Springfield, Dr. Tendai referred patients to a perinatologist for such services. Dr. Tendai tes-

---

**2.** Dr. Tendai treated S.G. and her partner for chlamydia, a sexually transmitted disease, in June 1992. The evidence at the commission hearing showed that chlamydia, when properly treated, does not generally present a danger during pregnancy.

**3.** "Sticky note" is the generic phrase used for products sold under trade names such as "Post–It Notes."

tified he had concerns about the perinatologist who could provide services to S.G. because he felt that she had a tendency to induce labor too early.

On November 9, 1992, S.G. again visited Dr. Tendai. He testified that he again warned S.G. of IUGR and advised her to see a perinatologist and that S.G. again refused. S.G. testified that Dr. Tendai's office nurse told her that the ultrasound had confirmed the IUGR diagnosis and that the doctor would discuss it with S.G. in more detail. S.G. testified that Dr. Tendai did not discuss the IUGR with her on November 9 and did not suggest that she see a perinatologist. In response to the healing arts board's investigation, Dr. Tendai produced a "sticky note" stating that he warned S.G. again on November 9, 1992, that she should see a perinatologist.

Dr. Tendai examined S.G. again on November 16 and 23, 1992; each visit revealed that S.G.'s fetus had not grown. He testified that he warned S.G. on each of these dates that she should see a perinatologist; S.G. testified that Dr. Tendai did not refer her to a specialist. Dr. Tendai testified he did not believe that inducing labor was appropriate because the position of the fetus' head would make a vaginal delivery dangerous, and the appropriateness of a caesarian birth could not be determined without an amniocentesis.

On November 29, 1992, after feeling no fetal movement for approximately 24 hours, S.G. went to the hospital, was given another ultrasound, and delivered a stillborn female child. The child weighed three pounds, six ounces. The umbilical cord was wrapped tightly around the child's neck. An autopsy report concluded that the cause of death was "most likely due to the combined effects of a tight nuchal cord [i.e., around the neck] and severe chronic villitis [an inflammation] of unknown etiology involving the placenta with associated fetal growth retardation. Other findings included a two-vessel umbilical cord. Although the two-vessel umbilical cords are associated with an increased incidence of fetal congenital malformations, no other congenital malformations are identified. The manner of death is natural." Tests conducted after the delivery revealed that S.G. had cytomagalic virus, an infection that may be associated with IUGR, but the evidence did not establish whether the virus was a cause of the growth retardation.

S.G. filed a complaint with the healing arts board, which assigned one of its investigators to investigate S.G.'s charges. When the board's investigator interviewed Dr. Tendai in April 1993, Dr. Tendai did not state that he had referred S.G. to a perinatologist. Rather, he said that he was concerned about the baby's lung maturity and did not want to refer S.G. to a perinatologist who would try to deliver the baby early. Dr. Tendai did not tell the investigator that S.G. had ignored his advice. He gave the board's investigator copies of his office records relating to S.G. No sticky notes were included. The sticky notes relating to S.G. were not in S.G.'s file; Dr. Tendai provided the sticky notes when he met with the board at a later time. The only documentation of Dr. Tendai's alleged referrals of S.G. to a perinatologist were in the sticky notes. The commission concluded that Dr. Tendai had not referred S.G. to a perinatologist.

According to Dr. Tendai's office manager, the doctor routinely used sticky notes to write personal, non-medical information about his patients. The information put on the notes was that which the doctor wished to have for personal reference later, but which he did not want to be copied and sent to the hospital as part of the patient's medical records.

During its investigation, the board requested that Dr. James S. Johnson, M.D., an obstetrician, review the medical records relating to S.G. In July 1993, Dr. Johnson completed a written report determining that several conditions, especially the umbilical cord wrapped around the neck, contributed to the baby's death and that Dr. Tendai had not been negligent in his care of S.G. Dr. Johnson testified that IUGR is often fatal or results in severe birth defects.

Around the time that she filed her complaint with the board, S.G. contacted a Springfield attorney to pursue a malpractice civil lawsuit. That attorney declined to represent S.G., but gave her the name of Dr. William Cameron, a Kansas obstetrician. S.G. then contacted Dr. Cameron requesting that he review her medical records and determine whether he believed Dr. Tendai had committed malpractice. After reviewing the medical records, Dr. Cameron referred S.G. to another attorney in Springfield.

The healing arts board presented a deposition of Dr. Cameron, S.G.'s malpractice expert, at the hearing. Dr. Cameron determined that S.G.'s baby's death was "preventable" and that, given proper monitoring by Dr. Tendai, the baby could have been delivered by caesarian section at an appropriate time before suffering fetal death. Dr. Cameron testified that babies with IUGR were usually able to catch up to their peers within six months of birth.

Once the diagnosis of IUGR was made, Dr. Cameron testified that the proper treatment would require bi-weekly monitoring and non-stress testing to monitor the fetus' heart activity. Dr. Cameron believed that Dr. Tendai's failure to take these steps violated the standard of care. Dr. Cameron did not believe that Dr. Tendai violated the standard of care before November 2, 1992; it was only after the ultrasound confirmed IUGR that Dr. Cameron felt Dr. Tendai did not take appropriate action.

Dr. Cameron testified that, if Dr. Tendai had referred S.G. to a perinatologist, such referral would have been appropriate to satisfy the standard of care. However, if no such referral was made, Dr. Tendai was required to monitor S.G. himself through non-stress tests.

Dr. Cameron testified that the failure to monitor S.G.'s condition properly violated the standard of care and constituted negligence. He was not asked and did not testify that Dr. Tendai's conduct was gross negligence. Nor did Dr. Cameron testify that he believed Dr. Tendai to be incompetent to act as a physician.

Dr. William Griffin, M.D., a professor of obstetrics and gynecology at the University of Missouri, was called by Dr. Tendai and testified that, to a reasonable degree of medical certainty, the cause of death was "a combination of factors," with the "terminal event" being strangulation by the umbilical cord. Dr. Griffin testified that, once IUGR was diagnosed, the monitoring Dr. Tendai performed was not adequate. Dr. Griffin testified that the proper procedure would have been to do non-stress testing to determine whether the fetus was getting enough oxygen. If the testing indicated that the fetus was not properly oxygenated, then an amniocentesis should have been performed to determine whether the fetus was mature enough to be delivered. Dr. Griffin testified that referring S.G. to a perinatologist would meet the standard of care, but that a failure to discuss IUGR with S.G. would violate the standard of care. As with Dr. Cameron, Dr. Griffin did not testify that Dr. Tendai was grossly negligent or that he was incompetent to act as a physician.

The hearing commission concluded that Dr. Tendai had not referred S.G. to a perinatologist, that he had not properly monitored S.G.'s pregnancy to determine when the birth could have been induced, and that such failure violated the standard of care.

The commission determined that this violation of the standard of care constituted "gross negligence," "repeated negligence," "incompetence," and "conduct harmful to the health of a patient"—which are among the grounds for professional discipline under the statute, section 334.100.2(5).[4]

Following the commission's decision, the healing arts board held a disciplinary hearing in April 2000. Dr. Tendai presented 80 previous disciplinary decisions of the board, which he believed to be factually similar, in which the board imposed either minor discipline or no discipline. The board's deliberations were conducted in closed session and were not recorded.

The board by order in May 2000 publicly reprimanded Dr. Tendai, suspended his license for 60 days, prohibited him from practicing obstetrics or doing obstetrical procedures, and required him to attend a medical documentation course.

Dr. Tendai appealed the board's disciplinary order to the circuit court of Cole County, which stayed the enforcement of the disciplinary order. In May 2001, the circuit court upheld the commission's findings of fact and conclusions of law and the board's discipline but did not rule on Dr. Tendai's equal protection claim regarding disparate disciplinary treatment.

Dr. Tendai then appealed to this Court in July 2001. This Court dismissed the appeal because the circuit court's judgment did not finally dispose of all issues. 77 S.W.3d 1 (Mo. banc 2002). The circuit court then remanded the case to the healing arts board, ordering it to make findings on the facts related to the equal protection claim. The board sought a writ of prohibition, arguing that the circuit court could not order the board to make factual findings on the equal protection claim. This Court issued its writ of prohibition in December 2003 and directed the circuit court to make factual findings on the equal protection claim. 121 S.W.3d 234 (Mo. banc 2003). The circuit court entered its judgment in June 2004, making specific findings and concluding that Dr. Tendai's equal protection rights were not violated. The circuit court affirmed the commission's decision and the board's discipline.

This appeal followed. This Court has jurisdiction because Dr. Tendai challenges the validity of a statute. Mo. Const. art. V, section 3.

## Standard of Review

The Board of Registration for the Healing Arts investigates complaints against physicians and other licensed professionals; when the board decides to proceed, it files complaints with an independent body,

---

**4.** The statute, section 334.100.2, provides, in part:

The board may cause a complaint to be filed with the administrative hearing commission as provided by chapter 621, RSMo, against any holder of any certificate of registration or authority, permit or license required by this chapter ... for any one or any combination of the following causes:
...
(5) Any conduct or practice which is or might be harmful or dangerous to the mental or physical health of a patient or the public; or incompetency, gross negligence or repeated negligence in the performance of the functions or duties of any profession licensed or regulated by this chapter. For the purposes of this subdivision, "repeated negligence" means the failure, on more than one occasion, to use that degree of skill and learning ordinarily used under the same or similar circumstances by the member of the applicant's or licensee's profession[.]

the Administrative Hearing Commission, which hears the case and enters its findings of fact and conclusions of law. If the commission finds cause to discipline a physician, the board then decides on the appropriate discipline, which is the final stage of the administrative process. Judicial review of the administrative decision is available, starting with the circuit court.[5]

■ This Court reviews the decisions of the hearing commission and the board, not the circuit court. *Mo. Coalition for the Environment v. Herrmann,* 142 S.W.3d 700, 701 (Mo. banc 2004); *State Bd. of Registration for the Healing Arts v. McDonagh,* 123 S.W.3d 146, 152 (Mo. banc 2003). Factual findings are reviewed to determine whether they are supported by substantial evidence. *Bruemmer v. Mo. Dept. of Labor Relations,* 997 S.W.2d 112, 115–16 (Mo.App.1999). When the commission has interpreted the law or the application of facts to law, the review *is de novo. McDonagh,* 123 S.W.3d at 152. The record is reviewed in the light most favorable to the commission's factual findings. *Mendelsohn v. State Bd. of Registration for the Healing Arts,* 3 S.W.3d 783, 786–87 (Mo. banc 1999).

In this case, the hearing commission labeled its determinations that Dr. Tendai committed gross negligence, repeated negligence, and conduct harmful to a patient and that he was incompetent as "conclusions of law." To the extent that these "conclusions of law" contain statements of fact or ultimate fact, the Court defers to the commission as fact finder if the conclusions are supported by competent and substantial evidence when considering the record as a whole. Section 536.140.2, RSMo 2000; *McDonagh,* 123 S.W.3d at 152.

## Dr. Tendai's Contentions

Dr. Tendai argues that: (1) section 334.100.2(5) is unconstitutionally vague, (2) his procedural due process rights were violated by the hearing commission's findings that he was subject to discipline, (3) repeated negligence cannot result from the treatment of a single patient for a single condition, (4) there was insufficient evidence to support the commission's determinations that he demonstrated incompetence, gross negligence, repeated negligence, and conduct harmful to a patient, (5) the board imposed disproportionately severe discipline in violation of the Equal Protection Clause, and (6) the board's disciplinary order was arbitrary, capricious, unreasonable, made upon unlawful procedure, and unsupported by competent and substantial evidence.

## Sufficiency of the Evidence

Because the commission's conclusions that there was cause to discipline Dr. Tendai's license were not supported by substantial evidence, the Court need not reach his other claims.

■ The commission concluded that Dr. Tendai violated the applicable standard of care in his treatment of S.G. and that this violation constituted gross negligence, repeated negligence, incompetence, and conduct harmful to a patient. Before examining each of these statutory grounds for discipline, the state of the medical record is considered. The medical record issue is whether Dr. Tendai's "sticky notes" are records that support his assertion that he referred S.G. to a perinatologist.

The hearing commission gave no weight to Dr. Tendai's testimony and to his "sticky notes" that were provided after the

---

**5.** Sections 536.100 and 536.110.1, RSMo 2000; *see* John S. Sandberg, "Fair Treatment for the Licensed Professional: The Missouri Administrative Hearing Commission," 37 Mo. L.Rev. 410 (1972).

healing arts board's initial investigation into his conduct.

The commission indicated in a footnote that there was evidence that Dr. Tendai's sticky notes were falsified. In the words of the commission, the notes "appear to have been written after the fact." Although falsification of records was not before the commission as a cause for discipline, the commission did resolve the credibility issue in the board's favor by refusing to believe Dr. Tendai's account of his treatment. This issue of credibility is for the commission. *See Lagud v. Kansas City Bd. of Police Com'rs*, 136 S.W.3d 786, 796 (Mo. banc 2004).

Regardless of whether the commission believed that the sticky notes were subsequently produced falsifications, the commission was correct in excluding the notes from consideration because they are not proper medical records.

■ Medical records relating to observations, treatment, and diagnoses are generally admissible as business records. *Long v. St. John's Regional Health Ctr., Inc.*, 98 S.W.3d 601, 607 (Mo.App.2003); *Caples v. Earthgrains Co.*, 43 S.W.3d 444, 452 (Mo.App.2001). The admissibility of business records in a professional licensing case before the commission is governed by section 536.070(10), RSMo 2000, which provides that a record is admissible "if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter."

■ Even if the notes, from the outset of the investigation, had been found with the regular medical record, the notes contained information that Dr. Tendai said he did not intend to transfer to another physician or hospital for use in S.G.'s care.

Medical records are considered trustworthy because they are made for the purpose of documenting a patient's treatment and conditions for future reference. Although Dr. Tendai said that he made the sticky notes for his later reference, the fact that the notes were not intended to be included in S.G.'s regular records and relied upon by other health care providers undermines their credibility. "Regular course of business" is defined by considering "the inherent nature of the business in question and ... the methods systematically employed for the conduct of the business as a business." *Palmer v. Hoffman*, 318 U.S. 109, 115, 63 S.Ct. 477, 87 L.Ed. 645 (U.S.1943). Since they do not qualify as business records, the sticky notes are hearsay. *See Kitchen v. Wilson*, 335 S.W.2d 38, 43 (Mo. 1960).

With the sticky notes properly excluded as medical record documentation, the factual issue was whether to believe Dr. Tendai or S.G. The hearing commission believed S.G., and her testimony is substantial and competent evidence to support the factual determination that Dr. Tendai did not refer S.G. to a perinatologist.

**Gross negligence**

■ The commission concluded that Dr. Tendai committed gross negligence in his treatment of S.G. "Gross negligence" is not defined in section 334.100.2(5). When a term is undefined, the legislature is presumed to intend that the term be used in its plain and ordinary meaning according to the dictionary. *Asbury v. Lombardi*, 846 S.W.2d 196, 201 (Mo. banc 1993). Random House Webster's Dictionary (1997) defines "gross" as "flagrant and extreme; glaring," and "negligence" as "1. the quality, fact, or result of being negligent; neglect. 2. an instance of being negligent. 3. the failure to exercise a rea-

sonable degree of care, especially for the protection of other persons."

This Court has not defined "gross negligence" in the professional licensing context.[6] The commission considered "gross negligence" to be "an act or course of conduct which demonstrates a conscious indifference to a professional duty that constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." *See Duncan v. Mo. Bd. for Architects, Prof. Engineers and Land Surveyors,* 744 S.W.2d 524, 533 (Mo.App.1988). The commission's definition is correct.

 The first step in determining whether gross negligence exists is to determine the applicable standard of care for ordinary negligence. The next step is to determine whether there was evidence of a gross violation of the standard. When the standard of care involves matters outside the competence and understanding of ordinary lay witnesses, it must be established by expert witness testimony. *Haase v. Garfinkel,* 418 S.W.2d 108, 113 (Mo.1967); *Swope v. Printz,* 468 S.W.2d 34, 39 (Mo. 1971). "The appropriate standard of care is a question of law." *Lopez v. Three Rivers Elec. Co-op., Inc.,* 26 S.W.3d 151, 158 (Mo. banc 2000). As to the standard of care, this Court's review is *de novo.*

The applicable standard of care, for ordinary negligence, is what the normal member of Dr. Tendai's profession would have done when treating a patient with IUGR under similar circumstances. *See*

*State Bd. of Registration for the Healing Arts v. McDonagh,* 123 S.W.3d 146, 159 (Mo. banc 2003). Dr. Cameron testified that his definition of the standard that Dr. Tendai violated was "the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of this profession," which is a definition of ordinary negligence. Dr. Cameron testified that the standard of care for treatment of IUGR requires bi-weekly monitoring and non-stress testing. Dr. Tendai violated that standard of care by his failure to procure this testing for S.G., Dr. Cameron testified.

There is a wide difference between "ordinary negligence" and "gross negligence." Not every deviation from a profession's standard of care is gross negligence—professionals make mistakes that neither show conscious indifference to their duties nor gross deviations from their profession's standards. There was nothing in Dr. Cameron's testimony to support a conclusion that Dr. Tendai's conduct showed conscious indifference to his professional duty or otherwise grossly violated the standard of care.

It is particularly difficult to infer gross negligence where there is a dispute in the record between members of the profession as to whether the physician's conduct was negligent at all. Dr. Johnson, the obstetrician who first reviewed the records for the healing arts board, submitted his written opinion that Dr. Tendai was not negligent in his treatment of S.G. Moreover, Dr.

---

6. Missouri courts have previously declined to recognize degrees of negligence in general tort law. *See, e.g., Fowler v. Park Corp.,* 673 S.W.2d 749 (Mo. banc 1984); *Warner v. Southwestern Bell Telephone Co.,* 428 S.W.2d 596 (Mo.1968). In *Duncan v. Mo. Bd. for Architects, Prof. Engineers and Land Surveyors,* 744 S.W.2d 524 (Mo.App.1988), the court of appeals recognized this general rule, but also recognized that the legislature must have

intended something more than simple negligence by its use of the term "gross negligence" in professional licensing statutes. *Duncan* determined that "it is clear that the term connotes an improper conduct greater either in kind or in degree or both than ordinary negligence." 744 S.W.2d at 532. The definition in *Duncan* properly recognizes the distinction that the statute makes.

Johnson would not even testify that failure to refer S.G. to a perinatologist was below the standard of care.

Dr. Griffin's testimony on Dr. Tendai's behalf, when construed most favorably to the hearing commission's decision, might support a finding of ordinary negligence because he testified that Dr. Tendai's monitoring of S.G. was not "adequate." But Dr. Griffin did not testify that Dr. Tendai's conduct violated the standard of care, that it was negligent, or that it was grossly negligent.

Ordinary negligence, in a medical malpractice case, is the failure to use the skill and learning that would ordinarily be used by a member of the defendant's profession in similar circumstances. *Meyer v. Lockard,* 118 S.W.3d 245, 250 (Mo.App.2003); MAI Instruction 11.06. Taken in the light most favorable to the commission's decision, the evidence from the expert witnesses was that Dr. Tendai failed to use the skill and learning that would normally be used by a member of his profession in similar circumstances by failing to refer S.G. to a perinatologist or by conducting the monitoring himself.

The healing arts board presented evidence that Dr. Tendai was negligent. The board, however, does not have authority to discipline for ordinary negligence; it may only do so for repeated negligence or gross negligence. Section 334.100.2(5).

 To demonstrate that a physician has committed *gross* negligence, the board must show that the physician engaged in a *gross* deviation from the standard of care. Expert testimony is needed to establish this point, since it is beyond the purview of ordinary lay witnesses. None of the expert witnesses in this case testified that Dr. Tendai showed a gross failure to use the skill and learning ordinarily used by members of the same profession. The board's strongest witness, Dr. Cameron,

only testified that Dr. Tendai had violated the standard of care—not that he had grossly violated the standard of care. Dr. Johnson, the board's initial reviewer, did not believe that Dr. Tendai was negligent at all. Dr. Griffin failed to articulate a standard of care and did not testify that Dr. Tendai grossly violated any standard or was grossly negligent or, even, for that matter, negligent.

Accordingly, there was no evidence to support the commission's conclusion that Dr. Tendai had committed gross negligence.

**Repeated negligence**

 The commission concluded that Dr. Tendai committed repeated negligence in his treatment of S.G. This conclusion was based on the fact that, during each of S.G.'s visits on November 2, November 9, November 16, and November 23, Dr. Tendai knew of S.G.'s IUGR and did not to refer S.G. to a perinatologist or undertake the proper testing himself.

Dr. Tendai argues that repeated negligence cannot be based on a doctor's conduct toward one patient, but rather requires independent negligent acts committed toward more than one patient. The commission concluded that there was negligence only as to S.G.

The logic of Dr. Tendai's position is similar to that for interpreting an act or acts of "gross negligence" as being something categorically different than ordinary negligence. By making "repeated negligence" a cause for discipline, the statute requires that the conduct show, by multiple acts, that the licensee is deficient in a generalized way and that disciplinary action is needed to protect the public.

There is no need, however, to reach Dr. Tendai's broad argument that "repeated negligence" cannot be found as to a single

patient. While there were three office visits after November 2, they all followed a single treatment decision—not to refer the patient to a perinatologist. Dr. Tendai's only negligent act or conduct was his decision to monitor S.G. by follow-up visits rather than to order further testing. Dr. Cameron's opinion that Dr. Tendai violated the standard of care was based on Dr. Tendai's failure to refer S.G. to a perinatologist or conduct the proper monitoring himself after November 2. Considering only the evidence that Dr. Tendai did not refer S.G. to a perinatologist—and discounting his testimony that he did so refer the patient—Dr. Tendai only made one negligent decision, the decision not to refer S.G. to a perinatologist. During S.G.'s subsequent visits after the November 2 decision, the doctor merely adhered to the decision he had previously made.

█ In the context of a disciplinary proceeding, to consider each of these three visits after November 2 to be a separate act of negligence is to engage in bootstrapping. In medical negligence litigation, where a "continuing care" exception is invoked to avoid the statute of limitations, the act of negligence is generally treated as a single act and is not divided into multiple separate acts of negligence, so that the negligence relates back to treatment that may otherwise have occurred before the period of the statute of limitations. *See Montgomery v. South County Radiologists, Inc.*, 49 S.W.3d 191, 194–95 (Mo. banc 2001); *Thatcher v. De Tar*, 351 Mo. 603, 173 S.W.2d 760, 762 (Mo.1943). Similarly, Dr. Tendai's actions, all part of the same treatment decision, can only be considered as a single negligent act. The record does not support the commission's conclusion that Dr. Tendai committed "repeated negligence," which is the statute's requirement.

## Incompetency

█ "Incompetency" is not defined in section 334.100.2(5). As with gross negligence, when a term is undefined, the Court looks to its plain and ordinary meaning according to the dictionary. *Asbury v. Lombardi*, 846 S.W.2d 196, 201 (Mo. banc 1993). Random House Webster's Dictionary (1997) defines "incompetence" as "the quality or state of being incompetent," and defines "incompetent" as "1. lacking qualification or ability; incapable. 2. characterized by or showing incompetence. 3. not legally qualified."

The commission considered the meaning of incompetency to be: "a general lack of present ability or lack of disposition to use a present ability to perform a given duty." That definition is appropriate.

█ "Incompetency" refers to a state of being. It is clear that incompetency means something different than "gross negligence" or "repeated negligence." Otherwise, there would be no reason to list "incompetency" in the statute as a separate ground for discipline and "incompetency" would be redundant. "[E]very word in a statute is presumed meaningful." *Gott v. Dir. of Revenue*, 5 S.W.3d 155, 158 (Mo. banc 1999). A doctor who is generally competent could commit gross negligence or repeated negligence; thus, "incompetency" must mean something different from these other terms.

Taken in the light most favorable to the commission's decision, the evidence that Dr. Tendai was incompetent is as follows: He was aware, as of November 2, 1992,[7] that S.G.'s fetus had IUGR and that the fetus had a two-vessel umbilical cord; the standard of care required that an amniocentesis or non-stress testing be complet-

---

7. Dr. Cameron did not fault any of Dr. Tendai's actions before November 2, 1992.

ed; Dr. Tendai did not have the equipment to conduct an amniocentesis or non-stress testing; Dr. Tendai was concerned that the only available perinatologist would try to deliver S.G.'s baby too soon; Dr. Tendai did not refer S.G. to a perinatologist, who could conduct the appropriate testing; and Dr. Tendai violated the standard of care by not referring S.G. to a perinatologist. This is evidence of ordinary negligence, but not incompetency.

None of the expert witnesses testified that Dr. Tendai was incompetent. There is no evidence that Dr. Tendai was not legally qualified to practice as a physician. The healing arts board did not present evidence that Dr. Tendai was incapable of practicing medicine or that he lacked the qualities needed for effective action or was unable to function properly as a physician.

Rather, Dr. Tendai made a decision—not to refer S.G. to a perinatologist or to do non-stress testing—which some, but not all, of the expert testimony cited as violating the standard of care. Although the board's evidence may have been sufficient to support a finding that Dr. Tendai was negligent, a finding of a negligent act—by itself—is not enough to establish incompetency because a competent physician can commit a negligent act.

**Conduct harmful to a patient**

The healing arts board alleged that Dr. Tendai was subject to discipline pursuant to section 334.100.2(5), which allows discipline for "[a]ny conduct which is or might be harmful or dangerous to the mental or physical health of a patient or the public ...". The commission concluded that Dr. Tendai's conduct was "harmful to the health of the patient," not that his conduct might or could have been harmful. That is the conclusion presented for review.

To sustain this conclusion, there must be evidence that Dr. Tendai's conduct caused injury to S.G.'s baby. In this case, the record must contain substantial evidence that Dr. Tendai's conduct caused or contributed to cause the baby's death.

Missouri follows the "but for" test of causation in medical negligence cases. *Callahan v. Cardinal Glennon Hospital,* 863 S.W.2d 852, 862–63 (Mo. banc 1993). Under this test, a physician is found to have caused a harm if the harm would not have occurred "but for" the physician's negligence. *Id.* at 861. In the absence of a statutory definition of "harmful to the mental or physical health of a patient," the "but for" standard of causation is applicable to this provision of section 334.100.2(5).

The board cannot rely on the mere fact that S.G.'s baby died *in utero* to support its contentions that Dr. Tendai's conduct caused the death. *See Swope v. Printz,* 468 S.W.2d 34, 39 (Mo.1971). S.G.'s baby was born with the umbilical cord wrapped tightly around its neck. The testimony from the expert witnesses indicated that IUGR, in and of itself, would not cause the baby to die; it would only cause the baby to be born smaller than normal. Nor was there any testimony that *in utero* growth retardation would cause an umbilical cord wrap.

The board's evidence on causation was equivocal and, thus, insufficient. Dr. Cameron, consulted initially by S.G. for a malpractice lawsuit, testified that he believed the baby's death was "preventable" if proper monitoring had been done. This is not a statement that Dr. Tendai's conduct was a "cause" of harm to the baby. If it could be interpreted as causation, it is equally likely to be a statement merely of timing—that is, if the baby had been delivered before fetal demise the death would have been prevented. This "preventable" theory of causation is too attenuated to

impose liability on a doctor for negligence or malpractice, *Callahan,* 863 S.W.2d at 865, and is likewise insufficient in a discipline case. There is nothing in the testimony of the case to suggest that the fatal cord wrap was anything more than a tragic accident that occurred shortly before the baby was delivered. There is not a single expert statement that, to a reasonable degree of medical certainty, Dr. Tendai's conduct caused harm to the baby.

To the contrary, the record as a whole negates a causal link between Dr. Tendai's conduct and the harm to the baby. Dr. Johnson believed the baby's death was caused by strangulation by the umbilical cord and that Dr. Tendai was not negligent. The autopsy supports this position. Dr. Johnson also testified that IUGR would not, in and of itself, have caused fetal death. Similarly, Dr. Griffin testified that the "terminal event" was strangulation by the umbilical cord. None of the expert witnesses was able to testify with a reasonable degree of medical certainty that IUGR—and not strangulation by the cord—caused the death. The board did not prove the suggested monitoring would have prevented strangulation by the umbilical cord.

Since the board did not prove causation, the commission's conclusion that Dr. Tendai committed conduct harmful to a patient is not supported by substantial evidence and must be reversed.

**Conclusion**

The central question necessary to decide this appeal is whether there was substantial evidence to support the commission's conclusions that Dr. Tendai's conduct constituted "gross negligence," "repeated negligence," or "conduct harmful to a patient," or that Dr. Tendai was incompetent. A careful review of the record before the commission shows that the commission's conclusions that Dr. Tendai was subject to discipline under section 334.100.2(5) were not supported by substantial evidence.

The judgment of circuit court is reversed.

WHITE, C.J., STITH, PRICE and RUSSELL, JJ., concur.

TEITELMAN, J., dissents in separate opinion filed.

LIMBAUGH, J., concurs in opinion of TEITELMAN, J.

RICHARD B. TEITELMAN, Judge, dissenting.

I respectfully dissent from the principal opinion to the extent it holds that there was insufficient evidence to support the commission's finding that Dr. Tendai committed repeated negligence and engaged in conduct harmful to the patient.

The primary purpose of statutes authorizing the board to discipline a doctor's license is to safeguard the public health and welfare. *Missouri Board of Registration for the Healing Arts v. Levine,* 808 S.W.2d 440, 442 (Mo.App.1991). To effectuate this purpose, the statutes must be construed broadly "with a view to suppression of wrongs and mischiefs undertaken to be remedied." *Bhuket v. State Board of Registration for the Healing Arts,* 787 S.W.2d 882, 885 (Mo.App.1990) (quoting, *Bittiker v. State Board of Registration for the Healing Arts,* 404 S.W.2d 402, 405 (Mo.App.1966)). Non-technical words and phrases in the statutes are to be given their plain, ordinary and usual sense. *Id.*

*Repeated Negligence*

The phrase "repeated negligence" is not a technical term and must be given its plain and ordinary meaning. The plain and ordinary meaning is set forth in section 334.100.2(5), which defines repeated negligence as the "failure, on more than

one occasion, to use that degree of skill and learning ordinarily used under the same or similar circumstances" by another physician.

The facts of this case perfectly track the statutory definition. Dr. Tendai examined S.G. on November 2, 1992, recognized that the fetus was not developing properly, and negligently failed to refer her to a perinatologist. Dr. Tendai examined S.G. on three subsequent occasions and, each time, recognized that the fetus was not developing properly. Although the fetus continued to display signs of abnormal development, Dr. Tendai repeatedly failed to refer S.G. to a perinatologist. Thurs., Dr. Tendai negligently failed to refer S.G. to a perinatologist on three separate occasions. This case fits squarely within the plain statutory definition of "repeated negligence." The principal opinion's attempt to construct a different meaning of "repeated negligence" through an analogy to the continuing care exception to the statute of limitations in medical negligence cases is, therefore, unwarranted.[1]

*Conduct which "is or might be" harmful to the patient or the public*

Section 334.100.2(5) permits discipline for "any conduct which is or might be harmful or dangerous to the mental or physical health of a patient or the public...." The commission found that Dr. Tendai's conduct was harmful to the health of S.G. There is substantial evidence in the record to support the commission's finding.

First, the autopsy concluded that "[i]ntrauterine fetal death was most likely due to the combined effects of a tight nuchal cord with severe chronic villitis of unknown etiology involving the placenta with associated intrauterine fetal growth retardation." The principal opinion states that the autopsy supports the position that the death was caused by strangulation "and that Dr. Tendai was not negligent." In fact, the autopsy report specifically mentions IUGR as a contributing factor to the death while offering no opinion as to whether Dr. Tendai was negligent. Where evidence warrants either of two opposed findings, the reviewing court must uphold the factual findings the agency has made. *Fritzshall v. Bd. of Police Commissioners,* 886 S.W.2d 20, 28 (Mo.App.1994). The autopsy findings supports the commission's decision that IUGR was a contributing factor to the baby's death and that Dr. Tendai's negligent monitoring of the IUGR was harmful to the patient. This Court is not in a position to substitute its lay medical judgments for the commission's factual findings.

Second, Dr. Cameron testified that the death could have been prevented if Dr. Tendai had properly monitored the development of the fetus. Specifically, Dr. Cameron testified that the death could have been foreseen and the baby could have been delivered via caesarian section. The principal opinion's rejection of Dr. Cameron's testimony as "a statement merely of timing" ignores the thrust of Dr. Cameron's testimony that, in this case,

1. An analogy is only as strong as the underlying comparison. The attempt to analogize concepts from fundamentally different legal contexts is not only unwarranted, it is also untenable. Medical malpractice litigation and physician discipline proceedings have different purposes. Malpractice litigation seeks compensation for injured patients, while disciplinary proceedings serve to protect the public from poor medical practice. Furthermore, the common law continuing care exception was created to benefit injured patients by preserving their claims against negligent physicians against the expiration of the statute of limitations. It is incongruous with the original impetus for the continuing care exception to argue that the exception supports a judicial construction of the disciplinary statutes that shields a negligent physician from discipline.

timing may have been crucial to the medical outcome. Again, this Court is no position to substitute its conjecture regarding medical matters for the factual findings of the commission. There is sufficient evidence to support the commission's decision to discipline Dr. Tendai's license for conduct which "is or might be harmful" to a patient.

I would uphold the circuit court's judgment affirming the discipline of Dr. Tendai's license for repeated negligence and conduct harmful to the patient.